## COMMONWEALTH *vs.* SAMUEL LaFAILLE.

No. 97-P-0111.

Middlesex. January 22, 1998. - January 14, 1999.

Present: BROWN, PERRETTA, & JACOBS, JJ.

Further appellate review granted, 429 Mass. 1102 (1999).

*Jury and Jurors. Practice, Criminal,* Examination of jurors, Motion to suppress, Disclosure of evidence, Conduct of prosecutor, Cross-examination by prosecutor. *Identification. Evidence,* Photograph.

In the circumstances of a criminal case, the judge should have conducted an individual voir dire of the venire on racial bias; the defendant was entitled to a new trial. [145-149]

This court concluded that, in a criminal case, a certain photographic array from which the defendant was identified was impermissibly suggestive; at the retrial of the case, the judge should make a determination whether the Commonwealth has demonstrated whether the other identifications of the defendant had a basis independent of the array. [149-150]

At the trial of a criminal case, the prosecutor improperly suggested in cross-examination "facts" that were unsupported by any evidence. [151-152]

Dismissal of criminal complaints by a District Court judge for the Commonwealth's failure to comply with discovery orders did not bar a subsequent prosecution of the offenses by indictments in the Superior Court. [152]

INDICTMENTS found and returned in the Superior Court Department on August 12, 1994.

A motion to dismiss was heard by *Martha B. Sosman,* J.; a motion to suppress evidence was heard by *Robert H. Bohn, Jr.,* J.; and the cases were tried before *Elizabeth B. Donovan,* J.

*Robert M. Goldstein* for the defendant.

*Abra Siegel,* Assistant District Attorney, for the Commonwealth.

BROWN, J. The defendant was convicted and sentenced on

indictments charging assault and battery by means of a danger-ous weapon (G. L. c. 265, § 15A), and possession of a firearm (G. L. c. 269, § 10[a]).[1]

On appeal, the defendant alleges that the trial judge improperly (1) denied an individual voir dire on racial bias; (2) admitted evidence at trial that had not been timely disclosed to the defendant; (3) denied defense counsel's request for a mistrial based on the prosecutor's improper and bad faith cross-examination; (4) denied the defendant's motion to dismiss based on the Commonwealth's failure to comply with a District Court's discovery orders; (5) denied the defendant's motion to suppress identifications; and (6) denied the defendant's motion for a new trial. The defendant also argues that the trial judge should have at a minimum granted him an evidentiary hearing on his motion for a new trial. Finally, the defendant argues that the combination of errors so unfairly prejudiced his jury trial that reversal of his convictions is required. See *Commonwealth v. Cancel*, 394 Mass. 567, 576 (1985). For reasons set out below, we conclude that the defendant is entitled to a new trial.

The facts in short summary are as follows. On December 31, 1993, an assailant shot and wounded Timothy Taddia outside of a restaurant and market in Somerville. According to witnesses, a group of young white women had been in the area buying take-out Chinese food when they were approached and alleg-edly harassed by a group consisting predominantly of young black males. One of the women telephoned her boyfriend, Tad-dia, and asked him to come and escort them home. When Tad-dia and his friends arrived at the scene, a fight ensued. In the course of that confrontation, one of the young men about whom the women had initially complained fired several shots into the air and then shot Taddia in the leg.

We mention only such other facts as are relevant to the analysis of the legal issues presented.

1. *Individual voir dire on the basis of racial bias*. The judge denied the defendant's request for an individual voir dire on racial bias, concluding that there was no substantial risk that the jurors would be affected by an extraneous issue. Pursuant to

[1]The defendant's convictions of possession of ammunition and discharge of a firearm within 500 feet of a building (G. L. c. 269, § 12E) were placed on file.

G. L. c. 234, § 28,[2] "the judge must examine the jurors individually when it appears that issues extraneous to the case might affect the jury's impartiality." *Commonwealth* v. *Grice,* 410 Mass. 586, 588 (1991), citing *Commonwealth* v. *Hobbs,* 385 Mass. 863, 873 (1982). When the extraneous issue is racial prejudice, "some limitations [have been placed] on a judge's discretion." *Commonwealth* v. *Grice, supra. Commonwealth* v. *Flebotte,* 417 Mass. 348, 355 (1994). See *Commonwealth* v. *Harrison,* 2 Mass. App. Ct. 775, 779 n.6 (1975). "This is especially true where the crime charged is one of interracial violence and the defendant has moved to have such an inquiry made." *Commonwealth* v. *Core,* 370 Mass. 369, 376 (1976).

"[A]ppellate decisions have consistently encouraged trial judges to respond generously to motions that they question jurors individually about possible [racial] prejudice." *Commonwealth* v. *Ramos,* 31 Mass. App. Ct. 362, 364 (1991), and cases cited. In refusing to conduct an individual voir dire we think the trial judge abused her discretion provided under G. L. c. 234, § 28, because there was a "substantial risk" that the jurors would be affected by an "extraneous issue." *Commonwealth* v. *Grice,* 410 Mass. at 588-589. See *Commonwealth* v. *Williams,* 6 Mass. App. Ct. 923, 924 (1978) (Brown, J., concurring). On this record there is ample basis "to suspect that a juror or jurors . . . [might] not be indifferent within the meaning of the statute." *Commonwealth* v. *Dickerson,* 372 Mass. 783, 793 (1977).

It is generally understood that there are three types of crimes which present a substantial risk that extraneous issues will affect the impartiality of the jury so that the judge must conduct an individual voir dire of prospective jurors. Those crimes are interracial rape, interracial murder, and sexual offenses against

[2]Section 28 reads in relevant part (as appearing in St. 1975, c. 335): "For the purpose of determining whether a juror stands indifferent in the case, if it appears that, as a result of the impact of considerations which may cause a decision . . . to be made in whole or in part upon issues extraneous to the case, including, but not limited to, community attitudes, possible exposure to potentially prejudicial material or possible preconceived opinions toward the credibility of certain classes of persons, the juror may not stand indifferent, the court shall . . . examine the juror specifically with respect to such considerations, attitudes, exposure, opinions or any other matters which may . . . cause a decision or decisions to be made in whole or in part upon issues extraneous to the issues in the case. Such examination . . . shall be conducted individually and outside the presence of other persons about to be called as jurors or already called."

children where the defendant and the child victim are from different races.[3] "Acts of sex and violence between members of different races were placed in the 'requiring individual voir dires' category in *Commonwealth* v. *Stephens*, 15 Mass. App. Ct. [461,] 465 [(1983)]." *Commonwealth* v. *Ramos*, *supra.*

The defendant presses two points to show that the case involves racial issues and that the judge should have conducted an individual voir dire to avoid substantial bias. First, the defendant argues that numerous potential jurors who were called to sidebar during impanelment indicated that race would be an issue in this case. For example, one woman at sidebar told the judge, "I live in Somerville, and I don't want scum like that walking around in the streets." Another told the judge at sidebar, "I have a daughter who . . . last year was accosted by a black person . . . somebody looking very much like that in Porter Square, and I don't feel very objective." The defendant argues that these reactions to the judge's questions demonstrate that the defendant could have been a target of racial prejudice.[4]

Second, the defendant asserts that the jury heard testimony demonstrating that racial prejudice was an issue in this trial. There was percipient witness testimony describing the defendant as a member of a group of five to seven black men. Contrast *Commonwealth* v. *Ramos*, 31 Mass. App. Ct. at 365. For example, the victim testified that "there were some black kids, some white kids in there. . . . [One of the group] was Hispanic." One witness testified, "I remember a white male with gray hair in there. I remember maybe five to seven black men in there and then us."

As discussed in *Commonwealth* v. *Ramos*, 31 Mass. App. Ct. at 366, the trial judge has no way of knowing how the trial will play out, but it is advisable to conduct an individual voir dire when asked to do so. Cf. *Commonwealth* v. *Flebotte*, 34 Mass. App. Ct. 676, 681 (1993) (Brown, J., concurring), *S.C.*, 417 Mass. 348 (1994). In *Ramos*, we determined that "[a] gang at-

---

[3]The Supreme Judicial Court, pursuant to its power of general superintendence, also requires in cases involving sexual offenses against minors the judge, on request, "to question each potential juror individually as to whether the juror had been a victim of a childhood sexual offense." *Commonwealth* v. *Flebotte*, 417 Mass. at 355.

[4]Cf. Will & McGrath, Crime, Neighborhood Perceptions, and the Underclass: The Relationship Between Fear of Crime and Class Position, 23 J. Crim. Justice 163 (1995).

tack by members of one racial group against members of another race is redolent with racial antagonism. . . . [I]t surely is an occasion to inquire of jurors whether racial feelings would affect the way they listened to and deliberated upon the case." *Id.* at 365.

In the case at bar the trial was not racially neutral and the "seepage of racial prejudice into the jury" was unavoidable and inevitable. See *Commonwealth* v. *Ramos,* 31 Mass. App. Ct. at 366. Moreover, unlike *Ramos,* where "the racial composition of the defendant's group" was unknown, *id.* at 365, here it was known[5]; not only was it apparent, it was highlighted.

The defendant was convicted of assault and battery with a dangerous weapon. Although the crime did not involve either murder or rape, it did involve potential interracial murder and sexual overtones (the victim, who was white, was shot in the leg by a black man; and the jurors heard testimony that the group of black males had been "flirting" with and harassing the group of white girls,[6] who later called their male friends to come and help them).[7] See generally Delgado, Rodrigo's Eighth Chronicle: Black Crime, White Fears — On the Social Construction of Threat, 80 Va. L. Rev. 503 (1994).

In addition, testimony revealed that one of the black men went over to one of the white girls (there were six in the group) and "kind of jumped right in [her] face and started asking [her] if [she] called him a nigger." Further, testimony at trial indicated that the first confrontation was with approximately five of the white males, who beat one of the black males[8] at a restaurant. It was after that incident that the confrontation escalated and one of the black males shot the victim in the leg.

All of these factors taken together indicate that the jurors

[5]In *Ramos,* "there was no direct reference by the prosecutor to the race or racial characteristics of the defendant. . . . The race of the defendant was, it seems, uncertain. Neither the testimony of witnesses nor . . . the opening statement and closing argument of the prosecutor spoke of a gang attack or alluded to racial differences between the assailant and the victim." *Commonwealth* v. *Ramos,* 31 Mass. App. Ct. at 365.

[6]This aspect of the case "gets right down to the core of the white man's fear." Wolfe, A Man in Full 497 (1998).

[7]The man who received the phone call testified that, after receiving the phone call, "I told everybody in the party [six white males] that the girls were in trouble and needed help."

[8]There was testimony describing the man who was beaten as either a light-skinned black man or "Hispanic" man.

should have been questioned individually as to whether racial feelings and beliefs would affect their deliberations. *Commonwealth* v. *Ramos*, 31 Mass. App. Ct. at 365. As the defense counsel noted in *Commonwealth* v. *Grice*, 410 Mass. at 588 n.4, questions that inquire of people's feelings about race are of a very sensitive nature, particularly in the Boston area, and "individuals are unwilling to bring these kinds of feelings to the attention of the court while they are in the group, in the venire."

2. *Motion to suppress.* The defendant contends that the motion judge improperly denied his motion to suppress the pretrial photo array and the lineup and in court identifications. See generally Liacos, Massachusetts Evidence § 10.3 (6th ed. 1994). In considering whether to suppress such evidence, the judge should consider the totality of the circumstances attending the confrontation to determine whether it was unnecessarily suggestive. *Commonwealth* v. *Botelho*, 369 Mass. 860, 865-869 (1976). See *Commonwealth* v. *Johnson*, 420 Mass. 458, 463-464 (1995).

Police investigation of this incident led to the prompt identification of one Donald Mills as having been a member of the group of young black men. A cellular phone belonging to Mills, whose true name was eventually discovered to be Simon Foley, was found at the scene.[9] The identity of the suspect who discharged the weapon had not yet been ascertained. On January 1, 1994, several mugbooks, each containing approximately sixty to eighty photographs, were shown to the witnesses; two pictures of the defendant were included, but no picture of him was selected. On January 29, 1994, the investigating officer showed an eight-photo array to five of the eyewitnesses. That array included two pictures of LaFaille, one taken in 1992 and another, with a different hairstyle, taken in 1993.[10] Two of the witnesses picked out the 1992 photograph of LaFaille as closely resembling the shooter. The victim, Taddia, picked out LaFaille's 1993 photograph as that of the man who had shot him.

The Commonwealth correctly asserts that "[d]uplication of a defendant's photograph in one or more arrays [is] not . . . sufficient by itself to compel the suppression of a resulting

[9]A false identification card in the name of Donald Mills was also found at the scene.

[10]The officer alleged that he did not realize that the array had two photos of LaFaille and that only subsequently was he informed of that fact.

identification." *Commonwealth* v. *Wallace*, 417 Mass. 126, 129 (1994), quoting from *Commonwealth* v. *Paszko*, 391 Mass. 164, 169 (1984). The instant circumstances, however, are distinct from *Wallace*[11] in that here there was only one photo array. Moreover, two of the three witnesses who viewed the array had previously failed to select the defendant's picture from three to five mug books (which, as mentioned above, contained two pictures of the defendant), although they had at that time selected photographs of Donald Mills (also known as Simon Foley) and Gary Selenxey. In addition, the small photo array, which was not shown to the witnesses until twenty-nine days after the incident, was not viewed in a timely fashion. Compare *Commonwealth* v. *Clark*, 378 Mass. 392, 395-396 (1979) (thirteen photos viewed twenty-one days after the crime). We think in these circumstances the photographic array was impermissibly suggestive.

As this was strictly an identification case, at any retrial the judge should revisit both the subsequent lineup and in-court identifications, giving particular attention to the question (not reached by the motion judge) whether the Commonwealth is able to prove by clear and convincing evidence that the lineup identification had an independent basis in the witnesses' observations of the defendant at the shooting.

3. *Evidence not disclosed to the defendant in timely manner.* We think that the defendant was prejudiced by the delayed disclosure of the records of a cellular telephone belonging to Simon Foley.[12] See and compare *Commonwealth* v. *Gregory*, 401 Mass. 437, 442 (1988); *Commonwealth* v. *Molari*, 31 Mass. App. Ct. 941, 942 (1991); *Commonwealth* v. *Caracino*, 33 Mass. App. Ct. 787, 793 (1993). In light of our decision to order a new trial we need say nothing further.[13] However, we note in passing that the Commonwealth had also been very tardy in

---

[11]In *Wallace*, 417 Mass. at 128-130, the showing to the witnesses of an array of black and white photos and an array of color photos with the defendant appearing in each array was held not unduly prejudicial.

[12]In an effort to connect Simon Foley and the defendant, the Commonwealth took the position that evidence of calls made around the time of the incident to the defendant's residence from Foley's cellular phone, which was found at the scene, "tie[d] . . . LaFaille even closer . . . to [the] shooting."

[13]Likewise, we do not discuss the denial of the defendant's motion for a new trial based on newly discovered evidence. See in this regard *Commonwealth* v. *Grace*, 397 Mass. 303, 305-306 (1986). Here, the so-called "newly discovered" evidence was the reemergence after two years of a key

providing the photo of and the print-out information concerning the man (one Gary Selenxey) that witnesses had identified as being present "at the scene attempting to stop some of his friends from harassing the girls."

4. *Improper cross-examination.* Consistent with its efforts to tie Foley and the defendant together, the Commonwealth attempted to show that the two men were related. It was improper for the prosecutor repeatedly to ask Paul Riley and Lisa Ann Sivits whether they knew that Donald Mills (Simon Foley)[14] was the defendant's cousin. See *Commonwealth* v. *White,* 367 Mass. 280, 285 (1975). The defendant and Foley, in fact, are not cousins. "It is error for a prosecutor 'to communicate impressions by innuendo through questions which are answered in the negative . . . when the questioner has no evidence to support the innuendo.' " *Commonwealth* v. *Fordham,* 417 Mass. 10, 20 (1994). "A prosecutor may not conduct cross-examination 'in bad faith or without foundation.' " *Id.* at 20-21.

The prosecutor did several improper things during cross-examination. First, the prosecutor did not have an expectation of an affirmative answer when he asked Riley and Sivits if Simon Foley was the defendant's cousin. The prosecutor asked Riley, "You know that this Donald Mills and the defendant, or Simon Foley, whatever his name is, and the defendant are cousins?" An objection to the question was sustained. The prosecutor then asked, "So you don't know about this person and any relationship they had?" The witness responded by saying, "Like I say, I don't know. As far as like, if you say — one thing I know is, like, up here, everybody calls themselves cousins, so I wouldn't know about that because I don't even know the kid." The prosecutor later also asked Sivits, "Are you aware that that person is the defendant's cousin?" Defense counsel's timely objection again was sustained.

In response to defense counsel's motion for a mistrial, the judge, at sidebar, admonished the prosecutor, concluding his remarks with the statements: "You put in no evidence on that

alibi witness, Simon Foley, who had been present at the scene but, for personal reasons unrelated to the shooting, had "made every effort to stay away from the Cambridge area and . . . from the Somerville area." Defense counsel could not locate him at the time of trial. Foley averred in his affidavit filed in connection with the new trial motion that he had made the calls from the cellular phone on the night of the incident, not to the defendant, but to the defendant's sister, whom he was dating at the time.

[14]As already mentioned, there was a question as to the witness's real name.

point. Now, I'm going to deny [the] request [for a mistrial], but I'm telling you, you're on a slippery slope . . . ."

The Commonwealth contends that two questions out of a ninety-five-page cross-examination do not amount to such error as could not be cured by the curative instructions that the judge gave. It is not the number of allegedly improper questions that raises concerns about prosecutorial misconduct in this case. See and compare *Commonwealth* v. *Long*, 17 Mass. App. Ct. 707, 708-709 (1984). The problem lies in the innuendo that was communicated to the jury, linking the defendant to Foley (Donald Mills). It is unlikely that this innuendo was ameliorated by the curative instruction. Further, the prosecutor went against the judge's orders by repeatedly asking the questions at issue here.

5. *District Court dismissal.* Prior to this trial, the District Court had dismissed the complaints against the defendant because of the Commonwealth's failure to comply with discovery orders. The defendant claims that this dismissal, which he asserts was with prejudice, bars a subsequent prosecution of him in the Superior Court. Passing over the question whether the defendant's failure to file an affidavit in the District Court and that court's failure to hold a hearing and make findings that late disclosure caused such irreparable harm that the defendant could not receive a fair trial preclude a dismissal with prejudice, see *Commonwealth* v. *Hernandez*, 421 Mass. 272, 277-279 (1995), we think the defendant's contention is answered adversely to him by *Commonwealth* v. *Zannino*, 17 Mass. App. Ct. 73, 76 & n.3 (1983). See *Monahan* v. *Commonwealth*, 414 Mass. 1001, 1002 (1993).

6. *Conclusion.* For the reasons discussed above, we reverse the judgments and set aside the verdicts. Because the errors also affected the convictions placed on file, we also reverse those convictions.[15]

*So ordered.*

---

[15]Although we do not ordinarily consider appeals from indictments placed on file, in a suitable case we may choose to do so. See *Commonwealth* v. *Chappee*, 397 Mass. 508, 523 (1986); *Commonwealth* v. *O'Brien*, 30 Mass. App. Ct. 807, 807 n.1 (1991).