## COMMONWEALTH *vs.* SAMUEL LAFAILLE.

Middlesex. May 4, 1999. - July 8, 1999.

Present: WILKINS, C.J., LYNCH, GREANEY, MARSHALL, & IRELAND, JJ.

*Practice, Criminal,* Dismissal, Motion to suppress, Examination of jurors, Voir dire, Disclosure of evidence, Cross-examination by prosecutor, New trial. *Evidence,* Photograph, Identification. *Identification. Jury and Jurors.*

Dismissal of criminal complaints by a District Court judge for the Commonwealth's failure to comply with discovery orders did not bar a subsequent prosecution of the offenses in the Superior Court on indictments. [46]

A criminal defendant did not demonstrate any basis on which a photographic identification of him should be suppressed. [47-49]

A Superior Court judge did not abuse her discretion in declining to conduct an individual voir dire of the jury venire on the issue of possible racial bias, where the defendant did not carry his burden of showing a "substantial risk" that race might influence the jury's decision. [49-53] IRELAND, J., concurring. MARSHALL, J., dissenting.

In a criminal case, the Commonwealth's tactics in response to the defendant's discovery requests violated the spirit of proper discovery; however, no substantial harm to the defendant's case resulted. [53]

At the trial of a criminal case, any chance of prejudice arising from the prosecutor's cross-examination of defense witnesses suggesting "facts" not supported by the evidence was cured by the judge's strong and prompt directives to the jury. [54]

A Superior Court judge did not abuse her discretion in denying a criminal defendant's motion for a new trial, where the judge had a basis for concluding that the evidence submitted in support of the motion was neither newly discovered nor credible. [54-55]

INDICTMENTS found and returned in the Superior Court Department on August 12, 1994.

A motion to dismiss was heard by *Martha B. Sosman,* J.; a motion to suppress evidence was heard by *Robert H. Bohn, Jr.,* J.; the cases were tried before *Elizabeth B. Donovan,* J., and a motion for a new trial was heard by her.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Abra C. Siegel*, Assistant District Attorney (*Daniel S. Field*, Assistant Attorney General, with her) for the Commonwealth.

*Robert M. Goldstein* for the defendant.

GREANEY, J. A jury in the Superior Court convicted the defendant of assault and battery by means of a dangerous weapon, illegal possession of a firearm, illegal possession of ammunition, and discharge of a firearm within 500 feet of a building. He was sentenced on the first two convictions to a term of imprisonment. The last two convictions were placed on file, the defendant not objecting.[1] The defendant appealed from his convictions and the denial of his motion for a new trial, arguing error in (1) the denial of his motion to dismiss; (2) the denial of his motion to suppress; (3) the decision of the trial judge not to conduct an individual voir dire of the jury venire; (4) the admission of evidence that had not been disclosed in a timely manner; (5) the denial of his request for a mistrial based on alleged prosecutorial misconduct; and (6) the denial of his motion for a new trial. The Appeals Court concluded that the defendant was entitled to a new trial. That court based its conclusion principally on the individual voir dire issue, but also determined that some of the other issues argued by the defendant had merit. *Commonwealth* v. *LaFaille*, 46 Mass. App. Ct. 144 (1999). We granted the Commonwealth's application for further appellate review. We conclude that the defendant has not demonstrated a basis for a new trial. Consequently, we affirm the order denying his motion for a new trial and his convictions of assault and battery by means of a dangerous weapon and illegal possession of a firearm.

The background of the incident may be briefly described as follows. On December 31, 1993, the victim, Timothy Taddia, a white male, was shot and wounded outside a restaurant and market in Somerville. A group of young women[2] had been in the area buying take-out food when they were harassed by a group of young white and black males.[3] One of the women

---

[1] In keeping with the usual practice, we do not review these convictions. *Commonwealth* v. *Ford*, 424 Mass. 709, 713 n.2 (1997), and cases cited.

[2] There was little evidence put before the jury about the racial makeup of the group of six young women who walked to the restaurant. No testimony specifically identified the races of the young women, and only two of them testified before the jury.

[3] Timothy Taddia, the victim, identified the group as consisting of from

telephoned her boy friend, Taddia, and asked him to come and help them. When Taddia arrived with some friends, words and a fight ensued. During the fight, a black man, identified as the defendant, fired shots from a handgun into the air and then shot Taddia in the leg.

1. The defendant filed a two-page motion in the District Court to dismiss the complaints on the ground that the Commonwealth had failed to provide discovery. The second page of the motion stated that dismissal was sought "with prejudice." A District Court judge endorsed the first page of the motion, "allowed." After indictments were returned in the Superior Court, the defendant, relying on *Commonwealth* v. *Silva*, 10 Mass. App. Ct. 784 (1980),[4] moved to dismiss them on the basis of the District Court's dismissal of the complaints for lack of timely discovery. A judge in the Superior Court (not the trial judge) denied the motion. In her memorandum of decision, the judge noted that (a) the District Court judge did not clearly express whether he was in fact dismissing the charges with prejudice; (b) the defendant should have been aware that, when the complaints were pending in the District Court, the Commonwealth intended to obtain superseding indictments; (c) the defendant's claim of prejudice had not been substantiated; and (d) the Commonwealth was in the process of gathering discovery information. For the reasons stated by the motion judge, and those expressed by the Appeals Court in Part 5 of its opinion, *Commonwealth* v. *LaFaille*, *supra* at 152, the order of the Superior Court denying the defendant's motion to dismiss was correct.

---

eight to ten individuals, "some black kids, some white kids" between the ages of eighteen and twenty years. Stacey Taddia, his sister, who was one of the young women standing in front of the restaurant, did not identify the racial makeup of the group, but stated that one of the young men was "light-skinned." Two other witnesses, who accompanied either Stacey or Timothy to the corner, said the group consisted of five to seven individuals, one stating that all were "black men," but later identifying one as Hispanic, and the other stating only that the most memorable person was a "light-skinned, possibly Hispanic" person. None of this group, including the defendant, was called to testify.

[4]In *Commonwealth* v. *Silva*, 10 Mass. App. Ct. 784, 790-791 (1980), the Appeals Court set aside a Superior Court verdict and dismissed the indictment against a defendant on the basis that a prior dismissal, with prejudice, of the complaint in the District Court was found to have been based on the denial of the right to a speedy trial, which bars subsequent prosecution by way of indictment. For the reasons we shall next explain, the *Silva* decision has no application here.

2. The defendant moved in the Superior Court to suppress pretrial identifications of the defendant made by the victim from a photographic array, and by the victim and a second Commonwealth witness at a lineup requested by the grand jury. The defendant argued that "a photographic array shown to the victim, and to several persons purported to be percipient witnesses to the shooting . . . and [the] subsequent lineup . . . were so unduly and impermissibly suggestive that they violated the defendant's Sixth Amendment and due process rights and, therefore, must be suppressed." A second judge in the Superior Court (not the trial judge) held an evidentiary hearing, made findings of fact and rulings of law, and denied the motion. The Appeals Court ordered that the denial of the motion to suppress be reconsidered at any retrial, stating its views that "the photographic array was impermissibly suggestive" (and, consequently, should have been suppressed), and that the judge at retrial should inquire "whether the Commonwealth is able to prove by clear and convincing evidence that the line-up identification[s] had an independent basis in the witnesses' observations of the defendant at the shooting." *Id.* at 150.

The motion judge's findings, which we accept because they are supported by the evidence, disclose the following. The day after the shooting, five percipient witnesses, who were later identified as friends of the victim, were allowed by Sergeant Charles Femino, the investigating Somerville detective, to scan several "mug" books containing sixty to eighty photographs each. None of the witnesses was able to recognize any photographs in the books even though they contained at least one photograph of the defendant. Several days after the shooting, the victim gave Sergeant Femino a description of the shooter. Subsequently, Femino compiled an eight-photograph array which contained in slot seven a photograph of the defendant taken in 1993.[5] Four of the witnesses to the shooting and the victim examined the array, and the victim identified the defendant from his photograph in slot seven. Two days later, Femino showed the array to an acquaintance of the defendant

[5]Sergeant Femino testified that he put together the photographic array approximately one month after the shooting, that he did so after he received information which we can infer pertained to the shooting from another officer in the Somerville police department, that he placed in the array "seven additional photos from the mug books that resembled the defendant," and that these other photographs were "randomly selected."

who noticed that the array contained a second photograph of the defendant in slot five which had been taken a year earlier than the photograph in slot seven. Until told by this person, Femino did not know that the array contained two photographs of the defendant.[6]

When the grand jury subsequently learned that the photographic array contained two pictures of the defendant, they requested a lineup which was conducted in a courtroom at the Middlesex County Court House on July 28, 1994. The lineup consisted of the defendant and six other men who were similar to him in height, weight, size, color and features. The victim identified the defendant at the lineup as the man who shot him. A second witness, who was present at the shooting, also separately identified the defendant as the person she had seen with a handgun.

The judge correctly refused to suppress the identifications made from the photographic array. The duplication of the defendant's photograph in the array was inadvertent, and the array was not arranged, or intended, by Sergeant Femino to evoke any improper identifications. In his decision, the judge carefully explained the significant dissimilarities between the defendant's photographs in slots five and seven, and, the judge's reasoning suggests that the differences tended to downplay the repetition. Duplication of a defendant's photograph in an array shown to witnesses or victims will not, by itself, require suppression of resulting identifications. See *Commonwealth* v. *Wallace*, 417 Mass. 126, 129 (1994); *Commonwealth* v. *Paszko*, 391 Mass. 164, 169 (1984); *Commonwealth* v. *Kostka*, 370 Mass. 516, 523-524 (1976); *Commonwealth* v. *Mobley*, 369 Mass. 892, 896-897 (1976); *Commonwealth* v. *Avery*, 12 Mass. App. Ct. 97, 101 (1981); *Commonwealth* v. *Vasquez*, 11 Mass. App. Ct. 261, 266 (1981). The victim had not seen the mug books, and the judge found that he "had ample opportunity to confront the defendant face to face before being shot." Sergeant Femino did not direct the witnesses' attention to any photograph in the array. The fact that the photographic array was assembled and shown about twenty-nine days after the shooting would not negate its efficacy as an identification tool. The judge also made careful findings and rulings on the fairness of the lineup, and he

---

[6]At the previous showing of the photographic array, two other witnesses indicated that the photograph in slot five "resembled the person involved but the hair was too long."

properly concluded that "the [lineup] identifications made by the victim and the percipient witnesses were based on their independent recollection of the features of the man who shot [the victim]." We conclude, as did the judge, that the defendant has not demonstrated any basis to suppress the identifications.

3. The defendant argues that the trial judge erred in declining to conduct an individual voir dire of the jury venire as to the issue of possible racial bias. The Appeals Court concluded that "the trial judge abused her discretion provided under G. L. c. 234, § 28, because there was a 'substantial risk' that the jurors would be affected by an 'extraneous issue.' " *Commonwealth* v. *LaFaille, supra* at 146, quoting *Commonwealth* v. *Grice*, 410 Mass. 586, 588-589 (1991). We conclude that no abuse of discretion has been shown.

The defendant did not file a pretrial motion requesting that the judge exercise her discretion to conduct an individual voir dire of the jury venire. Just before jury selection, the following discussion took place at sidebar:

DEFENSE COUNSEL: "Judge, we had a discussion earlier about the questions posed to the jury. I would suggest that this is an interracial type of a situation and perhaps at the sidebar, the court can inquire about the prospective jurors, whether they have any feelings with the defendant being a black male and the victim being white."

THE JUDGE: "This is assault and battery by means of a dangerous weapon?"

DEFENSE COUNSEL: "That's correct, Judge."

THE JUDGE: "It is not required in this type of a case."

DEFENSE COUNSEL: "I understand, Judge. It does have racial overtones and the general questions that are broadcast to the jury, people may be reluctant to raise their hand in open court."

THE JUDGE: "I wouldn't do an individual voir dire. I mean, if your client wishes, what I will do is I will ask all the venire. I'll have to have the client here and inquire of him whether he wishes me to ask them about any racial feelings they may have. Do you want to speak with him?"

DEFENSE COUNSEL: "Yes."

"([Defense counsel] converses with his client.)"

DEFENSE COUNSEL: "Judge, my client would like to have that question put forth to the jury."

The judge proceeded to examine the defendant, who agreed to have a question posed to the jury venire as a whole with respect to the issue of possible racial bias. See *Commonwealth v. Ramirez,* 407 Mass. 553, 555-556 (1990). The transcript discloses that the following question was posed to the venire along with ten other questions and that it received no response: "Would the fact that the defendant is black and the victim happens to be white affect your ability to be fair and impartial and render a true and a just verdict? No hands have been raised."

The judge next individually examined seventeen prospective jurors who had indicated affirmative answers to other voir dire questions than the one just quoted. From this group, three jurors (all of whom were excused) mentioned matters pertaining to race. Juror 01-10 stated a possible bias in these terms: "I have a daughter who is seventeen, who last year was accosted by a black person — not that person but somebody looking very much like that in Porter Square, and I don't feel very objective." Juror 03-2 put her possible bias in the following words: "Well, our jails are just loaded with young black men. I read that in Time magazine. I can't convict that baby-faced boy after a three-day trial. I don't want him to go to jail." Finally juror 03-15 stated that she could not be impartial because, "I live in Somerville, and I don't want scum like that walking around in the streets."

The defendant argues that a new trial is required because the judge did not exercise any discretion with respect to an individual voir dire, and, if we reject that contention, she abused her discretion in concluding that a general voir dire, which included a special question, was adequate.

"Under G. L. c. 234, § 28, the judge must examine the jurors individually when it appears that issues extraneous to the case might affect the jury's impartiality. *Commonwealth v. Hobbs,* 385 Mass. 863, 873 (1982). Ordinarily, it is for the judge to determine whether the jury might be influenced by an extraneous issue, and we will not disturb that determination 'unless the complaining party demonstrates that there was a substantial risk

that the case would be decided in whole or in part on the basis of extraneous issues.' *Commonwealth* v. *Mahoney*, 406 Mass. 843, 850-851 (1990), quoting *Commonwealth* v. *Sheline*, 391 Mass. 279, 290-291 (1984)." *Commonwealth* v. *Grice*, 410 Mass. 586, 588 (1991). We have held that a judge must examine jurors individually in cases involving interracial rape, *Commonwealth* v. *Sanders*, 383 Mass. 637, 640-641 (1981), interracial murder, *Commonwealth* v. *Young*, 401 Mass. 390, 398 (1987), and sexual offenses against children where the defendant and the child victim are of different races, *Commonwealth* v. *Hobbs*, *supra* at 873. These requirements were not based on constitutional mandate, but were grounded instead on our general superintendence powers in furtherance of the policy expressed in G. L. c. 234, § 28. In *Commonwealth* v. *Grice*, *supra* at 590, we declined to extend the requirements to cases involving interracial armed robberies.

As explained in the *Grice* decision, *id.* at 588, the defendant had the burden of showing a "substantial risk" that race might influence the jury's decision of the case. That showing should be made on the record before the jury selection process commences.[7] In attempting to satisfy this burden, a defendant must fully inform the judge of the basis for the request. The judge cannot be expected to be clairvoyant and to anticipate that testimony, or other events at trial, might give rise to an extraneous issue. On this point, we disagree with the Appeals Court's purported reliance on some of the testimony at trial to buttress its conclusion that, at the trial's inception, the judge abused her discretion in denying the defendant's request. *Commonwealth* v. *LaFaille*, *supra* at 147-148.

The record made by the defendant on the issue does not warrant a new trial. An assault and battery by means of a dangerous weapon "do[es] not involve the same degree of violence usually associated with murder and rape, nor do[es the crime] have a history of fomenting racial prejudice."[8] *Commonwealth* v. *Grice*, *supra* at 589. We are satisfied, as was the Appeals Court, that the judge, who is experienced, knew that she had discretion

---

[7] There may be a case where a request for individual voir dire is made and denied, and responses of prospective jurors to general questions discloses the need for the issue to be reconsidered, after a renewed request by the defendant. This is not such a case.

[8] We reject the defendant's argument that "individual voir dire questioning . . . should be required in every case of this sort."

on the issue. The judge was aware that the defendant was black and, as she explained to the jury venire, the case involved "some sort of an altercation alleged by the Commonwealth between some young white men and [the defendant]." The sidebar discussion set forth above reveals that an earlier meeting had taken place between counsel and the judge about the impanelment process. The discussion was not recorded and leaves us with no knowledge of what was said. Thereafter, defense counsel simply stated at sidebar that the case had "racial overtones," and that prospective jurors, if asked a general question, might "be reluctant to raise their hand[s] in open court." The reasons given by the three prospective jurors who did respond affirmatively to other general questions came after the judge had made her decision to forgo an individual voir dire. In any event, we do not consider the reasons expressed by these prospective jurors as necessarily establishing that the trial might raise racial prejudice as an extraneous issue.

If racial prejudice was a potential issue at trial, the burden was on the defendant's counsel to make an adequate contemporaneous record of any concerns. There is no record of any concern on the defendant's part as to the racial make up of the jury, nor did he make any claim that peremptory challenges were improperly used to influence the racial composition of the jury. The conference with the judge relating to the defendant's concern about the interracial aspect of the case took place off the record. Further, there was little (and some conflicting) evidence of the racial composition of the groups which included the defendant and the victim's sister on the evening in question, and because not all group members testified, the judge (and the jury) were unable to see the race of all participants in the incident.[9] Race was not emphasized in the opening or closing arguments.

The defendant failed to meet his burden. The judge did not abuse her discretion in concluding that there was no need for an

[9]The Appeals Court concluded that an individual voir dire was necessary based on observations that the defendant was a part of a "group of five to seven black men," who were "flirting" with and harassing a group of "white girls," and that the crime involved "potential interracial murder and sexual overtones." *Commonwealth* v. *LaFaille*, 46 Mass. App. Ct. 144, 147-148 (1999). There was conflicting testimony as to the races of the young men with the defendant. Nowhere in the record does it say that all the young women were white, and only the trial judge commented, just before jury empanelment, on the race of the group of young men accompanying the victim.

individual voir dire of the prospective jurors on the issue of possible racial prejudice.

4. The remaining issues raised by the defendant present no basis to order a new trial.

(a) A new trial is not required because of the Commonwealth's delayed disclosure of the records of telephone calls made from the cellular telephone found at the scene of the shooting and belonging to "Donald Mills" (actually Simon Foley, and to whom we will refer as Foley), which revealed that Foley had called the defendant's home repeatedly on the night of the incident. The defendant argues that, had he known what the telephone records revealed, he would have called his sister to rebut the Commonwealth's contention that the telephone calls had been made to him.

The defendant was made aware well before trial, by way of the initial police report, that the telephone records existed. The defendant was also told, in response to a request for discovery of any physical evidence, that all physical evidence was available for inspection. The defendant failed to make arrangements to examine the evidence. Prudent preparation should have included a visit to inspect all physical evidence.

However, when discussing the significance of what the telephone records revealed, the police report fails to mention that the defendant's was prominent among the telephone numbers listed. Further, although the Commonwealth provided four separate notices of discovery materials to the defendant, the telephone records are never mentioned. In view of the Commonwealth's intention to introduce evidence that Foley had made telephone calls to the defendant's residence, the Commonwealth's tactics violate the spirit, if not the letter, of proper discovery. See Mass. R. Crim. P. 14 (a) (2), 378 Mass. 874 (1979); Reporters' Notes to rule 14 (a) (2), Mass. Ann. Laws, Rules of Criminal Procedure, at 159-161 (Lexis 1997).

We discern no substantial harm to the defendant's case from his failure to call his sister to testify. Cf. *Commonwealth* v. *Fossa*, 40 Mass. App. Ct. 563, 568 (1996). The reasonably strong evidence placing the defendant at the scene would not be significantly undermined by testimony from a member of the defendant's family about the intended recipient of Foley's telephone calls. The telephone calls, in any event, establish a link between the defendant and Foley, and that was their major significance.

(b) The defendant argues that cross-examination by the prosecutor at trial was done in bad faith and without foundation, and that the judge erred in denying his request for a mistrial. The defendant asserts that the prosecutor's question to both of the defendant's alibi witnesses asking whether they knew that the defendant and Foley were cousins (which one witness answered in the negative; the other was not given the opportunity to answer) caused prejudice. While it is error for a prosecutor "to communicate impressions by innuendo through questions which are answered in the negative . . . when the questioner has no evidence to support the innuendo," *Commonwealth* v. *Fordham*, 417 Mass. 10, 20 (1994), quoting *Commonwealth* v. *White*, 367 Mass. 280, 284 (1973), there is no indication that the prosecutor asked the questions in bad faith. Sergeant Femino's investigative report stated that he was told by an acquaintance[10] of both the defendant and Foley that the men were cousins, and Femino was not allowed to testify to this hearsay at trial. It was logical that the prosecution might seek to establish the relationship between the defendant and Foley at trial by asking the question of other acquaintances of the defendant who testified as his alibi witnesses. See *Commonwealth* v. *Mahoney*, 400 Mass. 524, 531-532 (1987), and cases cited. There was no evidence offered to support the contention that Foley and the defendant were cousins. The trial judge cautioned the jury at the time the motion for a mistrial was denied: "[Q]uestions . . . phrased by the attorneys to a witness are not evidence, and you're not to consider them as evidence. . . . You've heard references made to one of the exhibits that you will have with you in the jury room as being a relative of the defendant. There is no evidence of that, whatsoever, and you can totally disregard any references to that. You are not to even discuss it when you are in deliberating the case." We conclude that any chance of prejudice was cured by the judge's strong and prompt directives to the jury.

(c) The defendant's motion for a new trial was properly denied. The motion was based on "newly discovered evidence." The defendant asserted that Foley, a witness to the shooting, had been located by the defense not long after the defendant was sentenced to jail. Foley claimed in an affidavit that he, but not the defendant, had been at the scene of the incident, and

---

[10]This was the same person who correctly pointed out that there were two photographs of the defendant in the array.

that a man named "Dread" or "Steven" had done the shooting. The trial judge considered several affidavits, including the one submitted by Foley, and she determined that the evidence offered was "not in fact within that [newly discovered evidence] category." Evidence at trial established that Foley had been at the scene on the night of the incident, and that the defendant, or at least his family, had ties to Foley. At the hearing conducted on the new trial motion, the defendant's counsel stated that Foley had dated the defendant's sister from before the shooting until eight months after it. The sister lived with, or upstairs from, the defendant at the time of the shooting. The defendant's counsel claimed that unsuccessful efforts had been made to make contact with both "Donald Mills" and Simon Foley, but that no files on the matter could be located by the private investigators the defense had hired.

To prevail on a new trial motion based on allegedly newly discovered evidence, a defendant must establish that the evidence is in fact newly discovered, is both credible and material, and that it casts real doubt on the justice of the conviction. *Commonwealth* v. *Grace*, 397 Mass. 303, 305 (1986), and cases cited. The first point requires a showing that reasonable diligence would not have uncovered the evidence by the time of the trial. *Commonwealth* v. *Ramirez*, 416 Mass. 41, 47 n.12 (1993), quoting *Commonwealth* v. *Grace*, *supra* at 306. In view of the relationship between the defendant's family and Foley, the lack of a showing describing in any detail the defendant's efforts to find Foley, and the unconvincing nature of Foley's story (especially in light of the positive identifications of the defendant), the judge had a basis to conclude that the evidence was neither "newly discovered" nor credible. The judge did not abuse her discretion in denying the new trial motion. See *Commonwealth* v. *Grace*, *supra* at 307.

5. The order denying the motion for a new trial is affirmed. The judgments of conviction of assault and battery by means of a dangerous weapon and illegal possession of a firearm are affirmed.

*So ordered.*

IRELAND, J. (concurring). I agree with the majority that the record does not support the conclusion that the judge committed

an abuse of discretion by refusing to conduct individual voir dire of the potential jurors. Therefore, I concur in the conclusion the court reaches today.

In reviewing a judge's ruling for abuse of discretion, an appellate court is only to consider that which was before the judge when the ruling was made. As the majority notes, we cannot expect judges to be "clairvoyant" and predict what extraneous issues may arise as the trial unfolds.[1] The Appeals Court considered trial testimony in reaching its conclusion that the trial judge abused her discretion. See *Commonwealth* v. *La-Faille*, 46 Mass. App. Ct. 144, 148-149 (1999). As this testimony was not before the judge when she made her ruling, it should not have been considered in reviewing that ruling.

The dissent argues that comments made by prospective jurors to the judge at sidebar during voir dire should have caused the judge to reconsider her decision not to question individually the venire about racial bias. During voir dire, three prospective jurors told the judge at sidebar that they might be biased. On race-based grounds one indicated that she would be biased in favor of the defendant, and another indicated that she would be biased against the defendant. A third prospective juror said that the defendant was "scum." From the standpoint of an appellate court reviewing the record of this case, there is no way to know if this "scum" comment was a racially motivated one. This is especially true in light of the fact that we do not know the race of the declarant. The comments of these prospective jurors, while warranting their dismissal from the panel, are insufficient to compel the conclusion that on hearing them the judge was required to question individually the remaining members of the venire.

While I agree with the conclusion we reach today, I write separately because I believe that in cases of serious interracial violence, such as this one, where a defendant specifically requests individual voir dire regarding potential juror prejudice, the judge should conduct such an inquiry, and that should be the rule in future cases.[2] General Laws c. 234, § 28, vests judges with discretionary power to determine when to examine the ve-

---

[1]Had the record disclosed what was discussed at the unrecorded lobby conference, my conclusion may have been different. However, as the majority notes, the record sheds no light on what was said at this conference.

[2]Even if the court were to adopt the rule I propose, it would only be given prospective effect and I would, therefore, still agree with the conclusion the

nire individually. However, we have required individual questioning of jurors for cases that involve certain types of interracial violence because they are so likely to evoke racial prejudice. See *Commonwealth* v. *Young*, 401 Mass. 390, 398 (1987) (interracial murder); *Commonwealth* v. *Hobbs*, 385 Mass. 863, 873 (1982) (interracial sexual offenses against children); *Commonwealth* v. *Sanders*, 383 Mass. 637, 640-641 (1981) (interracial rape). I believe that the time has come to expand this rule to recognize that cases of serious interracial violence are highly likely to evoke "considerations which may cause a decision or decisions to be made in whole or in part upon issues extraneous to the case," G. L. c. 234, § 28, and therefore, "inherently call for individualized questioning of potential jurors, if the defendant so requests." *Commonwealth* v. *Seguin*, 421 Mass. 243, 248 (1995), cert. denied, 516 U.S. 1180 (1996).

Mandating individual voir dire in these types of cases would effectively implement the statutory purpose set forth in G. L. c. 234, § 28, ensuring that jurors are truly indifferent. "Racial prejudice may be either blatant and easy to detect or subtle and therefore more difficult to discern." *State* v. *Williams*, 113 N.J. 393, 428 (1988). Whichever form it takes, the fair and proper administration of justice commands that steps be taken to remove this improper influence from the jury panel. The judge below questioned the venire as a whole regarding potential racial prejudice. While some individuals may raise their hands on such prompting and come forward to announce to the judge that they are prejudiced, common sense dictates that many potential jurors harboring such views will not be so publicly forthcoming. See generally Developments in the Law — Race and the Criminal Process, 101 Harv. L. Rev. 1472, 1583-1584 (1988) ("In a public setting, few are likely to admit to being prejudiced. Others may not admit to prejudice in this situation because they want to serve on the jury. [E]ven honest potential jurors may not be aware of their own biases. As racial prejudice becomes more subtle and less conscious . . . more extensive voir dire [is] necessary"); Poulin, The Jury: The Criminal Justice System's Different Voice, 62 U. Cin. L. Rev. 1377, 1428-1430 (1994) ("The questioning on voir dire is generally conducted in the presence of other members of the venire, caus-

court reaches today. See *Commonwealth* v. *Young*, 401 Mass. 390, 398 (1987) (rule applied only to future cases); *Commonwealth* v. *Hobbs*, 385 Mass. 863, 873 (1982) (same); *Commonwealth* v. *Sanders*, 383 Mass. 637 (1981) (same).

ing concern that jurors will be reluctant to speak freely and candidly. The circumstances encourage the prospective juror to claim that he or she will judge the case fairly''). We should recognize the need to seek out and remove this often elusive "impaired objectivity" in the context of racial prejudice, as we have in the context of sexual assaults. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 355-356 (1994) ("Individual voir dire of [venire to encourage potential jurors who were victims of sexual assault to be forthcoming] would further assist the judge in uncovering signs of impaired objectivity''). Because many people will seek to avoid publicly drawing attention to these hidden biases, the goal of § 28 cannot be effectively attained absent such individualized questioning.

A jury panel free of any bias against the defendant is essential to the operation of a fair trial. See *Aldridge* v. *United States*, 283 U.S. 308, 315 (1931). Recognizing the great importance of this issue, we have previously opined that, "when a motion that prospective jurors be interrogated as to possible prejudice is presented, we believe the trial judge should grant that motion." *Commonwealth* v. *Lumley*, 367 Mass. 213, 216 (1975). Requiring individual voir dire in cases of major interracial violence is a logical and reasonable step toward removing these improper influences from the jury panel.

I recognize that this requirement will impose an added burden on trial judges. But weighed in the balance, that burden is a reasonable price to pay to ensure that defendants are provided that to which all citizens of the Commonwealth are entitled — a fair and impartial jury. .

MARSHALL, J. (dissenting). I agree with the majority that it was in the discretion of the trial judge initially to determine whether to conduct an individual voir dire of the jury venire on the issue of possible racial bias. I also agree that a defendant has the initial burden of showing that there is a "substantial risk" that race may influence the jury. But in this case of interracial violence, I dissent because the judge should have conducted an individual voir dire.

Defense counsel had raised the subject of juror bias with the judge in a lobby conference. He acknowledged during a bench conference that an individual voir dire was not automatic, but asked the judge to question jurors individually because of the

racial overtones of the case. He also expressed his concern that members of the venire might be reluctant to raise their hands in open court in response to a general question concerning potential racial bias. That is precisely what happened. The judge addressed a general question to the venire: "Would the fact that the defendant is black and the victim happens to be white affect your ability to be fair and impartial and render a true and just verdict?" Her question came after she had told the venire that the case involved "some sort of altercation alleged by the Commonwealth between some young white men and [the defendant]." Prospective jurors could see the defendant, who is black. Nevertheless, no member of the venire raised a hand. Up until that point, there was no reason for the judge to have any concern. Thereafter, two prospective jurors, individually questioned by the judge at sidebar where their comments could not be generally heard, told the judge that they could not be objective in this case for reasons relating explicitly to racial bias. A third, when questioned individually, referred to this black defendant as "scum." At that point, given the racial overtones of the case and the fact that none of these three previously had raised a hand in response to the judge's general question about racial bias, the judge should have been alerted to the problem of racial bias. She should have reconsidered her decision and conducted an individual voir dire of each prospective juror.

It would not place any particular burden on trial judges to require that they remain alert to issues of racial bias in a case of this nature. As Justice Ireland describes in his concurrence, many potential jurors harboring views of racial bias will not be publicly forthcoming, but will be if examined individually. *Ante* at 57. When it became clear that a general question to the jury venire had not been adequate to ensure the impartiality of the jury, an individual voir dire became necessary. I respectfully dissent.