COMMONWEALTH vs. JOHN R. FORDHAM.

Bristol. November 4, 1993. - February 8, 1994.

Present: LIACOS, C.J., NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Homicide. Evidence*, Cross-examination, Prior misconduct. *Malice. Practice, Criminal*, Judicial discretion, Argument by prosecutor, Instructions to jury. *Constitutional Law*, Confrontation of witnesses. *Witness*, Impeachment, Bias.

The judge at a criminal trial, who suspended cross-examination of a prosecution witness to allow the witness to consult overnight with counsel, did not impair the defendant's right to confront the witness or otherwise deny him a fair trial, where the defendant did not demonstrate a reasonable likelihood that his counsel could have elicited testimony during an uninterrupted cross-examination that would have been of more than minimal value to the defense. [18-20]

At a criminal trial, no substantial likelihood of a miscarriage of justice was occasioned by the prosecutor's inappropriate question to the defendant on cross-examination or by a remark in his closing argument. [20-21]

The judge's instruction to the jury at a murder trial on the issue of malice did not create a substantial risk of a miscarriage of justice where the issue at trial was not the presence of malice but rather the identity of the person who shot the victim. [21-22]

At a murder trial, evidence of the defendant's prior assault on the victim, his wife, was properly admitted as probative of his state of mind toward her [22-23], and evidence of his assault on a man he suspected of having a relationship with his wife was also admissible on the same ground [23].

INDICTMENT found and returned in the Superior Court Department on June 29, 1988.

The case was tried before *Chris Byron*, J.

*Kevin S. Nixon* for the defendant.

*Elspeth B. Cypher*, Assistant District Attorney, for the Commonwealth.

O'CONNOR, J. The defendant appeals from his conviction of the murder in the first degree of his wife, Lisa Fordham, following a trial by jury. He argues that the trial judge erred by suspending at 3:15 P.M. until the next day the cross-examination of a principal Commonwealth witness, the defendant's son, Robert, just as the witness "began to recant . . . the damning testimony that he had given on direct." The defendant also argues that unfounded inflammatory accusations contained in the prosecutor's leading questions on cross-examination of the defendant, and presented again in the prosecutor's closing argument to the jury, were unfairly prejudicial; that the judge's instructions to the jury defining the malice required for murder were incorrect; and that "other bad acts" evidence was improperly admitted. In addition, the defendant requests that we exercise our extraordinary power under G. L. c. 278, § 33E, to reduce the verdict to manslaughter or murder in the second degree. We conclude that there was no reversible error and that justice does not require reduction of the verdict to less than murder in the first degree. We affirm the judgment.

We recite those facts which the evidence would have warranted the jury in finding and are helpful to an understanding of the issues on appeal. The defendant and Lisa married in 1987. By April, 1988, their relationship had begun to deteriorate. After a fight during which the Brockton police were summoned to their home, Lisa moved to an apartment in Taunton. During the next month she obtained a restraining order against the defendant.

In an attempt at reconciliation, the defendant spoke by telephone with Lisa's sister, Valerie Ware, twenty to thirty times between the time he and Lisa separated and the day she was killed. The defendant complained to Ware that Lisa was abusing drugs, and that he suspected she was committing adultery. At one point in May, the defendant told Ware that Lisa had ruined his life and that he hated her. He speculated that, for $10,000, he could arrange "a hit" on Lisa's boss, one of the men with whom he suspected she was having an affair, and he asked Ware to tell Lisa that Ware and her

husband were separating and needed help with their daughter so that Lisa would return to the defendant.

On May 27, at approximately 9:15 P.M., a police officer responded to Lisa's apartment complex and found her crying hysterically in the parking lot, bleeding from the nose and mouth. Lisa stated that the defendant had caused her injuries, and she was taken to a hospital where she was treated and released. The officer accompanied Lisa to the hospital and observed additional bruises on her legs and breasts. The defendant acknowledged this attack, testifying that he had struck Lisa "a couple of times because [he] was angry, [and] was in pain" from her kicking him in the groin area, causing him to fall and break his right hand. The next day, in order to avoid having to face criminal charges, the defendant resigned from the company where he and Lisa were employed, and left Massachusetts for Virginia Beach where his children and former wife lived.

While in Virginia Beach, the defendant went with several relatives to purchase an automobile part from Steven Foxwell. Foxwell testified that during this meeting, while the defendant's relatives were outside, the defendant stated that Lisa had left him and asked Foxwell to obtain heroin or liquid acid for him in order to "set her up so he could put her away for a long time." Foxwell further testified that the defendant "said that if he couldn't get the drugs, he was going to kill her."

Robert W. Fordham, the defendant's son, testified for the Commonwealth. Robert had been in jail awaiting trial as an accessory to Lisa's murder, and he testified that his testimony was being given pursuant to an agreement with the Commonwealth. He stated that his understanding of his agreement with the Commonwealth was that "after [his] truthful testimony, [he would] be recommended to get time served for the amount of time [he had] been in jail." Robert testified that, in early June, 1988, the defendant asked him to accompany him from Virginia Beach to Massachusetts to help him reclaim his Isuzu automobile from Lisa. The defendant told Robert that he planned to try to negotiate a fi-

nancial settlement with Lisa but, if the negotiations failed, to take the Isuzu. He explained that he needed Robert's help because of his broken hand. While in Virginia, the defendant purchased a .22 caliber pistol and a .30-.30 caliber rifle. Those two weapons ultimately were used to shoot Lisa.

According to Robert's testimony, he and the defendant arrived in Taunton on June 7 and rented a motel room under an assumed name. On either that night or the next, according to Robert's testimony, the defendant punched a hole in the gas tank of an automobile that was parked at the apartment complex where Lisa lived, explaining to Robert that the automobile belonged to one of Lisa's boy friends. A neighbor, John Forest, who owned the automobile, noticed that it was leaking gasoline, and he moved it across the street to a construction site and attempted to fix the leak. Robert and the defendant followed Forest across the street, and the defendant struck Forest with a baseball bat, knocking him unconscious. Before leaving the site, the defendant set the gasoline on fire. Forest was found lying unconscious near his burning automobile and was hospitalized.

Robert told the jury that, on June 8 and 9, he and the defendant watched and followed Lisa, using a variety of rented vehicles for that purpose. They purchased numerous items connected with their surveillance including binoculars and a camera, and they dyed their hair. The defendant cut the stock and barrel off the rifle he had purchased in Virginia Beach, explaining to Robert that it would be easier to carry. The stock, barrel, a broken hacksaw blade, and metal shavings were wrapped in paper, stuffed in a plastic bag, and discarded at a roadside restaurant along with the empty boxes of hair dye. The defendant also called Lisa during those two days. He told Robert that she had refused to agree to a settlement and had told him that she had a gun she would use to kill him if the police did not arrest him.

We continue with a recitation of Robert's testimony. At about 7:30 A.M. on June 10, the day Lisa was killed, the defendant and Robert drove to the parking lot of the GTE plant where Lisa worked and they took the Isuzu. Robert

drove the Isuzu to Virginia, arriving at his mother's home in the late afternoon. The Virginia Beach police spoke with him at that time. Robert received a telephone call from the defendant the next morning in which the defendant asked for a ride from the Richmond, Virginia, airport. When Robert drove to Richmond, he found the defendant, who had shaved off his beard, standing on the side of the road. The defendant told Robert that he had just returned a rental automobile after driving "all back roads from Massachusetts." While they were in the Isuzu, Robert told the defendant that the police were looking for him and that they had said that the defendant had killed Lisa. The defendant admitted that he had shot Lisa. He described her wounds and said that he had handed the .22 caliber pistol to her after it had jammed.

Three GTE employees observed the shooting of Lisa and, although unable to identify the assailant, testified at trial about the incident. The jury heard from them that Lisa had been shot to death in the GTE parking lot by a white man, who was approximately five feet, ten inches tall, with dark hair, a mustache and a beard. Lisa and the man had engaged in a prolonged physical struggle during which she was held and struck by the man. She was then shot in the shoulder with a .22 caliber pistol, struck on the head with a sawed-off .30-.30 caliber rifle that the man had taken from his automobile, and shot in the back and head at close range with the rifle. Lisa's body was found with the .22 pistol clenched in her hand.

The defendant testified, acknowledging that he had called and followed Lisa in several successive rental automobiles and that he had dyed his and Robert's hair, but denying that he had shot or witnessed the shooting of Lisa. He testified that, after following Robert to Interstate 95 on June 10, when Robert drove the Isuzu back to Virginia, he visited two of Lisa's drug dealers and rented a third vehicle. As he was returning to the motel, he encountered and recognized a third drug dealer riding a motorcycle, whom he described as five feet, ten inches tall, with dark hair and a moustache. According to the defendant's testimony, the dealer, upon

learning from the defendant that Lisa was unlikely to be able to pay a $7,000 drug debt from her marriage settlement, drew a gun, put it to the defendant's head, and took the defendant's keys. The dealer found the defendant's rifle in the trunk, threatened to kill Lisa if she could not pay her debt, and instructed the defendant to ride the dealer's motorcycle to Richmond where they would meet the next day. The defendant testified that he followed these instructions and that, when the dealer appeared at the Richmond airport the following morning to exchange vehicles, the dealer described the killing in details which the defendant later shared with Robert. The dealer then threatened to kill the defendant unless the drug debt was paid in thirty days. The defendant subsequently shaved his beard and called his family for help. He traveled extensively for approximately five months before his arrest, using an assumed name, and testified that he had done so in order to find Lisa's killer and to settle his financial affairs so that he could retain an attorney.

Several additional witnesses testified to a variety of statements made by the defendant about the killing. A coworker testified that the defendant had told him that he had hired a dealer to kill Lisa and was in hiding because he had never paid for the job and was afraid the dealer would kill him. The defendant's sister testified that the defendant had refused to turn himself in, saying he was afraid he would be killed in jail by the same dealers who had killed Lisa, had asked her for $50,000, and had eventually confessed to killing Lisa. The victim's sister testified that the defendant had told her that he had been present and held as a captive when the victim was shot, and that he had been left tied to a chair for one week. Two Massachusetts troopers who met with the defendant on December 12, several days after his arrest in Texas, testified that the defendant claimed he had been present in the parking lot, held captive by a black male in a Cadillac, while another black male killed his wife. Joseph Fordham, one of the defendant's sons, testified that the defendant had said he had been present in the parking lot, watching to see if the victim was going to come out with a "secret lover,"

and had seen a man, who he thought was one of Lisa's drug dealers, kill her. When Joseph asked the defendant why the victim was killed, the defendant told him, "I don't know why. All I know is, she'll never be able to mess around on me again."

We turn now to the first issue, which relates to the suspension of the defendant's cross-examination of the defendant's son, Robert. The defendant, represented on appeal by new counsel, argues that "by suspending cross-examination of the cooperating alleged accessory so that he could confer with counsel, the judge substantially impaired the defendant's right to confrontation, and denied him a fair trial." The defendant observes that the "most damaging portions of Robert's testimony were his description of the defendant's attack on Mr. Forest and his claim that the defendant admitted that he had shot and killed the victim." On cross-examination, Robert testified that he had told the police many lies, signing false statements and telling "all different kinds of stories." The following exchange then occurred:

> *Q.*: "Now, the statements you made up for Trooper Butler you say are lies; is that right, sir?"
>
> *A.*: "Ya, all the stories I told him."
>
> *Q.*: "Well, you told him that your father said he killed Lisa and shot her. That was one of the lies you made up for Trooper Butler, wasn't it, sir?"
>
> *A.*: [No response]
>
> *Q.*: "That was one of the lies you made up for Trooper Butler, wasn't it, sir?"
>
> *A.*: "Ya."
>
> *Q.*: "Your answer is yes, sir?"
>
> THE PROSECUTOR: "Your Honor, may we approach the side bar?"
>
> THE JUDGE: "Approach the side bar."

A bench conference then took place, which we set forth in part:

THE PROSECUTOR: "I'm going to suggest that [defense counsel] is getting this witness to possibly perjure himself."

THE JUDGE: "He's getting what?"

THE PROSECUTOR: "He's getting this witness to perjure himself. And I suggest that the witness ought to have an opportunity to consult with his attorney before he testifies any further."

DEFENSE COUNSEL: "This is a heck of a time to ask for a recess, if your Honor please. He's well aware of what the plea bargain is, I would suggest to you. I'm sure he has his attorney here today in court. The question was put to him about truthfulness and the truthful nature of the plea agreement. I suggest that if you're going to have a recess, it ought to be after an extended period of cross-examination."

The judge asked the prosecutor what risk the witness was running, and the prosecutor answered: "He's running the risk of, number one, perjuring himself right now and, number two, abrogating his agreement. And I don't know if he knows that he's doing that or not. I'm not certainly speaking for him, but that's certainly a potential risk that this witness is facing." The judge decided that Robert, the witness, "ought to have the advice of counsel." The witness's attorney was not present so, at 3:15 P.M., the judge declared a recess and at 3:40 P.M. adjourned for the day. Cross-examination of Robert resumed at 12:15 P.M. the following day. At that time, defense counsel did not return to the interrupted line of questioning.

The evidence disclosed to the jury that Robert was testifying pursuant to an agreement with the Commonwealth which, the jury could have concluded, might have motivated Robert to shape his testimony in order to please the prosecutor. In addition, cross-examination of Robert disclosed that he had repeatedly lied to the police, telling them "all different kinds of stories." Then, Robert testified on cross-examination that he was lying when he told the police that the

defendant had admitted to being Lisa's killer, from which it would follow that Robert had been lying under oath, that is, committing perjury, when he told the jury on direct examination that the defendant had admitted to being Lisa's killer.[1] Defense counsel, then, was not prevented from obtaining Robert's recantation of one of the two portions of Robert's testimony that the defendant characterizes on appeal as the "most damaging portions of Robert's testimony."

"The Sixth Amendment to the Constitution [of the United States] guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.' This right is secured for defendants in state as well as federal criminal proceedings under *Pointer* v. *Texas*, 380 U.S. 400 (1965). Confrontation means more than being allowed to confront the witness physically. 'Our cases construing the [confrontation] clause hold that a primary interest secured by it is the right of cross-examination.' *Douglas* v. *Alabama*, 380 U.S. 415, 418 (1965). Professor Wigmore stated:

> 'The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination*. The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers.' 5 J. Wigmore, Evidence, § 1395, p. 123 (3rd ed. 1940). (Emphasis in original)."

*Davis* v. *Alaska*, 415 U.S. 308, 315-316 (1974).

The defendant was not denied the opportunity to demonstrate the possible bias of the witness through his cross-examination of Robert, nor was he denied the opportunity to show Robert's lack of commitment to the truth. Indeed, the defendant was able on cross-examination to obtain Robert's admission that his testimony as to the crucial matter of the

---

[1] A review of the transcript demonstrates that, in responding to counsel's questions, Robert used the terms "ya" and "yes" interchangeably.

defendant's admission had been perjurious. It may well be that the declared recess until the next day to enable Robert to confer with his lawyer about the possible consequences to him of committing perjury and violating his agreement with the Commonwealth was neither required nor the best course for the judge to have taken. However, we need not decide whether the judge erred in that regard because, accepting the fact that the recess broke the momentum of the cross-examination, but also having in mind that Robert had already been severely impeached, the defendant has not demonstrated that it deprived him of a realistic opportunity to elicit from Robert further testimony that would have benefited the defense. At some point, more impeachment becomes surplusage. If the jury believed Robert's direct testimony that the defendant had admitted to killing Lisa, despite the fact that Robert was testifying pursuant to a plea arrangement, despite his having told the police "all kinds of stories," and despite his testimony on cross-examination that he was lying when he told the police the defendant had admitted to killing Lisa and, inferentially, that he was lying in his direct testimony when he told the jury the same thing, it is not reasonably likely that further admissions to other lies would have led to a different result.

The defendant argues that he "should not be penalized because he is unable to demonstrate specific prejudice resulting from the recess." Despite our having repeatedly said in criminal cases focusing on rulings limiting the scope of cross-examination, that the defendant bears the burden of showing both an abuse of discretion and prejudice, see *Commonwealth* v. *Barnes*, 399 Mass. 385, 393 (1987); *Commonwealth* v. *Repoza*, 382 Mass. 119, 125 (1980), *S.C.*, 400 Mass. 516, cert. denied, 484 U.S. 935 (1987), we would agree that a defendant ought not be required to prove what an opposing witness's testimony would have been if further cross-examination had been permitted or not "de-railed" as the defendant claims it was here. However, a defendant must show a reasonable likelihood that, had the cross-examination been permitted to continue without interruption, testimony of

more than minimal value to the defendant might have been forthcoming. No such showing has been made in this case.

The defendant's next contention is that, during cross-examination of the defendant, the prosecutor's leading questions contained unfounded assertions that were calculated unfairly to inflame the jury, and that similar assertions, not based on evidence, were made in the prosecutor's closing argument. The defendant did not object at trial to these assertions and requested no curative instructions.[2] "In considering issues argued on direct appeal as to which the defendant's appellate rights were not preserved by an objection or in some other manner, we apply the standard of G. L. c. 278, § 33E (1990 ed.). We must decide whether there is a substantial likelihood that a miscarriage of justice has occurred." *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992).

There was evidence that, after the defendant's confrontation with Lisa on May 27, he purchased a plastic drop cloth, cable cord and trash bags, and that those items were in the defendant's possession in Massachusetts on the day Lisa was killed. There was also evidence that at the time of the killing the defendant was in possession of a hacksaw and a blade. The prosecutor asked the defendant during cross-examination, "You intended to kill her and cut her up, didn't you — put her in the bags . . . and throw her away?" The defendant answered, "You're crazy," and stated that he "never had any intention of killing [his] wife." In his closing, the prosecutor argued that the items purchased on May 27 added to the proof of deliberate premeditation.

It is error for a prosecutor "to communicate impressions by innuendo through questions which are answered in the negative . . . when the questioner has no evidence to support the innuendo." *Commonwealth* v. *White*, 367 Mass. 280, 284 (1975), quoting ABA Standards Relating to The Prosecution Function § 5.7(d) (Approved Draft 1971). A prosecutor may

---

[2]As we have said earlier in this opinion, defense counsel on appeal was not trial counsel.

not conduct cross-examination "in bad faith or without foundation." *Id.* at 285. It is extremely unlikely that the prosecutor in this case expected an affirmative answer to his question or that his purpose in asking it was to gain an admission. Rather, it appears that he was using cross-examination to communicate an impression (and perhaps also to imply that he, the prosecutor, had some as yet undisclosed information) by innuendo. The question should not have been asked. The prosecutor could not reasonably have expected the defendant to give an affirmative answer in response. Also, the propriety of the prosecutor's argument in his summation to the jury that the defendant's purchase and possession of the items referred to above added to the proof of deliberate premeditation is at least questionable. We conclude, however, on the basis of the evidence we have recited, which is augmented by other evidence, that the inappropriate question, and the argument in summation, even if it too was inappropriate, did not result in a substantial likelihood of a miscarriage of justice.

The defendant next argues that he was prejudiced by an erroneous charge to the jury concerning malice aforethought. The defendant correctly points out that "[m]alice as an element of murder 'may be proved by evidence establishing any one of three facts beyond a reasonable doubt: if without justification or excuse, (1) the defendant intended to kill the victim (the so-called first prong of malice), or (2) the defendant intended to do the victim grievous bodily harm (the second prong), or (3) in the circumstances known to the defendant a reasonably prudent person would have known that, according to common experience, there was a plain and strong likelihood that death would follow the contemplated act (the third prong).' *Commonwealth* v. *Sneed*, 413 Mass. 387, 388 n.1 (1992). *Commonwealth* v. *Burke*, 414 Mass. 252, 265 (1992)." The defendant contends that "[t]he judge never instructed on first-prong malice, and his instructions on second- and third-prong malice permitted a finding of malice on evidence amounting to proof of manslaughter." We need not dissect the judge's jury instructions. The defendant did not object at trial to the aspects of the instructions that he

now contends were erroneous, and therefore the only question before us is whether the instructions viewed in their entirety created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright, supra* at 681. We are content that they did not. There was no live issue at trial concerning whether the person who, according to the evidence, shot Lisa in the shoulder with a pistol and then in the back and head with a rifle after a prolonged struggle was guilty of murder. The live issue was the identity of the killer. Any misstep in the judge's definition and explanation of malice to the jury clearly did not create a substantial likelihood of a miscarriage of justice in this case. See *Commonwealth* v. *Burke, supra* at 265-266.

The defendant did object at trial to the introduction of the evidence set forth earlier in this opinion concerning his assault on Lisa on May 27 and alleged assault on Forest on June 7, 1988. He argues that he was unfairly prejudiced by that evidence of prior bad acts. Evidence of a defendant's prior bad acts presents "the danger that, because a defendant appears to be a bad man capable of, and likely to commit, such a crime as that charged, a jury might be led to dispense with proof beyond a reasonable doubt that he did actually commit the crime charged. Moreover, it is not fair that a defendant in the course of a trial should be called upon to defend himself against accusations not set forth in the indictment." *Commonwealth* v. *Stone,* 321 Mass. 471, 473 (1947). As we have held on numerous occasions, however, evidence of prior bad acts may be admissible not to prove bad character or the defendant's propensity to commit the kind of crime with which he is charged, but for other relevant purposes. See *Commonwealth* v. *Leonardi,* 413 Mass. 757, 763 (1992); *Commonwealth* v. *Robertson,* 408 Mass. 747, 750 (1990); *Commonwealth* v. *Gallison,* 383 Mass. 659, 672 (1981). Evidence that has relevance to issues other than bad character or criminal propensity is admissible if not outweighed by its unfair prejudice, which is a determination for the judge to make and one which we do not disturb unless, in our judgment, it is palpably wrong. *Commonwealth* v. *Robertson,*

*supra* at 750. *Commonwealth* v. *Young*, 382 Mass. 448, 463 (1981).

. The evidence of the defendant's assault on Lisa on May 27 was highly probative of his attitude toward her, and therefore of whether he had a reason to kill her. See *Commonwealth* v. *Martino*, 412 Mass. 267, 279-281 (1992); *Commonwealth* v. *Robertson, supra* at 751-752; *Commonwealth* v. *Gil*, 393 Mass. 204, 215-216 (1984). While, as the defendant points out, there was other evidence of the defendant's state of mind with respect to Lisa, we see no error, let alone palpable error, in the judge's balancing of the relative probative value and unfair prejudice of the evidence of the defendant's May 27, 1988, attack against Lisa.

The evidence concerning the defendant's alleged assault against Forest was also relevant to the defendant's attitude toward Lisa in that it tended to show the defendant's belief that Lisa had been unfaithful to him and his resulting anger and hostility. Again, there was no palpable error in the judge's determination that fairness would be served by allowing the jury to hear that evidence.

We have reviewed the entire case on the law and the evidence. We are satisfied that the verdict was consonant with justice. We decline, therefore, to exercise our extraordinary power under G. L. c. 278, § 33E, to reduce the verdict or order a new trial. See *Commonwealth* v. *Jefferson*, 416 Mass. 258, 259, 265-268 (1993).

*Judgment affirmed.*