## COMMONWEALTH vs. SHAUN JENKINS.

Suffolk. November 5, 2010. - February 4, 2011.

Present: IRELAND, SPINA, COWIN, BOTSFORD, & GANTS, JJ.

*Evidence,* Hearsay, Cumulative evidence, Cross-examination, Consciousness of guilt, Impeachment of credibility. *Practice, Criminal,* Cross-examination by prosecutor, Argument by prosecutor, New trial, Instructions to jury, Assistance of counsel, Capital case. *Constitutional Law,* Fair trial, Waiver of constitutional rights, Assistance of counsel. *Waiver.*

At a criminal trial, the judge did not err in admitting in evidence one piece of allegedly hearsay testimony, where the testimony was not offered for the truth of its contents and was merely cumulative of other testimony [793-794]; further, any error in the admission of a second piece of hearsay testimony was not prejudicial, where that testimony was also merely cumulative [794-795].

There was no merit to a criminal defendant's argument that the prosecutor, at trial, improperly cross-examined the defendant's mother without an adequate basis for certain questions. [795-796]

At a murder trial, the prosecutor, in closing argument, did not improperly exhort the jury to do "justice" [796]; did not, in the circumstances, cause a substantial likelihood of a miscarriage of justice by stating that the defendant should be held accountable [796-797]; did not improperly use the word "we" to align himself with the jury and convey his personal belief in the credibility of evidence [797]; and permissibly used a rhetorical flourish to describe the evidence [797-798].

At a murder trial, a comment by the prosecutor in closing argument, when considered in context, did not improperly suggest that there had been an identification of the defendant by a witness where none had been made [798-800]; further, any discrepancy in the prosecutor's characterization of certain testimony was not meaningful [800-801], and the evidence supported the prosecutor's statement that the defendant previously had "pulled a gun" on the victim [801]; finally, the prosecutor's slip of the tongue, to which the defendant did not object, was tempered by the strong weight of the evidence and the judge's instructions to the jury [801-802].

A Superior Court judge hearing a criminal defendant's motion for a new trial did not abuse his discretion in concluding that the defendant's waiver of his right to testify was the product of a purposeful and informed judgment on his part. [802-804]

There was no merit to a criminal defendant's contentions that he received ineffective assistance of counsel due to counsel's failure to impeach the Commonwealth's key witness [804-808]; counsel's failure to object to the prosecutor's closing argument [808]; or counsel's advice regarding whether the defendant should testify [808-810].

INDICTMENT found and returned in the Superior Court Department on April 4, 2003.

The case was heard by *Thomas E. Connolly*, J., and a motion for a new trial was heard by him.

*Stewart T. Graham, Jr.*, for the defendant.

*Helle Sachse*, Assistant District Attorney, for the Commonwealth.

COWIN, J. The defendant was convicted by a jury in the Superior Court of murder in the first degree on the theory of deliberate premeditation. The defendant appeals from that conviction and from the denial of his motion for a new trial. He argues that, at the trial of the case, two allegedly hearsay statements were erroneously admitted; the prosecutor improperly cross-examined the defendant's mother without an adequate basis for certain questions; and the prosecutor's closing argument was improper. Further, the defendant contends that the judge erred in denying his motion for a new trial because he did not validly waive his right to testify. The defendant asserts also that he received ineffective assistance of counsel due to counsel's failure to impeach the Commonwealth's key witness; counsel's failure to object to the prosecutor's closing argument; and counsel's advice regarding whether the defendant should testify. We reject the defendant's arguments and, after review of the entire record, determine that there is no reason to exercise our extraordinary power pursuant to G. L. c. 278, § 33E, to reduce the murder verdict or grant him a new trial. We affirm the defendant's conviction and the order denying the motion for a new trial.

1. *Facts.* We briefly summarize the facts the jury could have found. Most of the evidence is discussed in conjunction with the specific arguments raised. The victim, Stephen Jenkins, was a cousin of the defendant. The defendant, an admitted drug dealer, "set up" the victim in the drug business (selling cocaine in Wareham) and introduced the victim to his own "clients." The victim repaid the favor by encroaching on the defendant's business by selling bags of "crack" cocaine that were larger and cheaper than those sold by the defendant. Parties in this trade do not take their business disputes to court; rather, the defendant began threatening to kill the victim because of his unfair business practices, and, on December 15, 2001, the morning after the defendant was beaten and disrobed by the victim, the defendant carried out his threats

and shot the victim in a car in the Dorchester section of Boston. After the killing, the defendant fled to North Carolina for a few days. Approximately one year later, he learned that there was a warrant for his arrest and turned himself in.

2. *Hearsay statements.* The defendant asserts error in the admission of two pieces of allegedly hearsay testimony. The defendant objected to the admission of both. First, the defendant maintains that certain testimony of Tamisha Miranda, the girl friend of the victim, should not have been admitted. Miranda was a Commonwealth witness and testified concerning an incident at a barber shop in Brockton several days before the killing. Miranda stated that, while waiting in a car in front of a barber shop for the victim, she saw the defendant and four other men. Street lights assisted her view of the group. She heard the defendant yell at the victim, accusing the victim of stealing his customers. The victim said that the defendant should not be upset, that it was just business. Miranda saw the defendant show the victim a gun. One of the other men screamed and said to the defendant, "You don't want to do this here." The defendant and the four men jumped in a car and drove away. The victim returned to Miranda's car and, while driving erratically, said, "I can't believe he f'n pulled out a gun on me."[1]

The defendant objected to the admission of the testimony that one of the men said, "You don't want to do this here." The statement was admitted as a spontaneous utterance on the ground that displaying a firearm on a public street is a sufficiently exciting event that the stress of the moment is likely to render the declarant's statement reliable. See *Commonwealth* v. *Moquette*, 439 Mass. 697, 704-705 (2003). The defendant contends that the foundation was insufficient to qualify the statement as an excited utterance. We need not resolve this dispute.

The testimony was not offered for the truth of its contents and thus was not hearsay. See *Commonwealth* v. *Kenney*, 437 Mass. 141, 152 (2002). The statement was a part of the event described by the witness. Cf. *Commonwealth* v. *Silva-Santiago*, 453 Mass.

---

[1]There was no objection at trial, and no argument to this court, that the statement of the victim was not admissible. Even if it were not, the statement would have been merely cumulative, see discussion *infra*, and thus could not have created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Barbosa*, 457 Mass. 773, 799-800 (2010).

782, 802-803 (2009). It was not offered to prove a fact. Although the judge admitted the testimony on one basis, we may affirm the ruling if there is another basis for doing so. See *Commonwealth* v. *McCutcheon*, 51 Mass. App. Ct. 715, 720 (2001), citing *Commonwealth* v. *King*, 389 Mass. 233, 234 (1983). Moreover, the testimony was merely cumulative of other testimony. Craig Jenkins,[2] another cousin of the defendant and the key Commonwealth witness, testified that several days before the killing, the defendant told him about a dispute with the victim at a barber shop in Brockton. Craig also said that the defendant stated that he had pulled out a gun on the victim and "tried to fuckin' buck that dude, man, but the gun got jammed." Craig defined the word "buck" as meaning "attempted to shoot . . . with a gun." Thus, it is clear that the defendant was saying that he tried to shoot the victim and regretted that the gun "got jammed." In view of this damning account of the incident from Craig, repeating the defendant's own words, Miranda's report that "another guy" said, "you don't want to do this here," was no more than cumulative. Cf. *Commonwealth* v. *Galicia*, 447 Mass. 737, 747-748 (2006).

The other asserted hearsay testimony came from Craig repeating a statement of Kenitra Newton, the defendant's girl friend. Approximately one week before the murder, the defendant, his cousin Craig, and Newton were in a minivan. Angry with the victim for taking his drug business, the defendant stated, "[T]his wasn't a fucking game and . . . he was going to fucking erase that dude." Newton said, "Stephen [the victim] don't fuckin' know Shaun, Shaun will kill his ass." Craig testified that he could not remember if the defendant said anything in response to Newton's remark. The defendant objects to the admission of Newton's statement that the defendant "will kill his ass."

The Commonwealth argues that, because the defendant would be expected to deny any such intention, the statement was admissible as an adoptive admission. Such an admission is one "made in the presence of the defendant to which the defendant's response — whether by oral declaration, by gesture, or by revealing silence — objectively denotes the defendant's acceptance of the statement." *Commonwealth* v. *Stewart*, 450 Mass. 25, 34 (2007),

---

[2]Because Craig Jenkins shares the same last name as the defendant and the victim, we refer to him henceforth by his first name.

quoting *Commonwealth* v. *Babbitt*, 430 Mass. 700, 705 (2000). Because here the witness could not remember what, if anything, the defendant responded, there was no response, by silence or otherwise, that signifies the defendant's acceptance of the statement. Consequently, the admission of the statement was error. The error in admitting the statement, however, was not prejudicial. In the same conversation, the defendant himself was quoted as saying: "This wasn't a fucking game and that he was going to fucking erase that dude." Thus, the erroneously admitted statement was merely cumulative. See *Commonwealth* v. *Francis*, 432 Mass. 353, 366-367 (2000).

3. *Foundation for cross-examination.* The defendant maintains that the prosecutor improperly cross-examined the defendant's mother. The defendant's mother was called as a witness by the Commonwealth and the prosecutor asked her a series of questions about keeping a gun for the defendant. When the defendant objected, the prosecutor justified the inquiries on the basis that George Hooker, a former boy friend of the mother, would testify to the facts supporting the questions. The prosecutor continued asking questions in an attempt to establish a connection between Hooker, the defendant, the murder, and a gun. The mother answered each inquiry in the negative.

The defendant contends that the prosecutor used innuendo to create an impression that the defendant kept a gun at his mother's home and that the defendant had argued with Hooker about it. The defendant argues that the tactic constituted "prosecutorial misconduct" in violation of *Commonwealth* v. *Fordham*, 417 Mass. 10, 20-21 (1994) (attorney may not create impressions by innuendo through questions answered in negative when questioner has no evidence to support such innuendo). The defendant did not object to the questions on this ground. Regardless, the prosecutor stated that Hooker was expected to testify, was "cooperative" with the police and that the mother's "own words" to Hooker were that she was holding a gun for the defendant. On this record, the fact that the Commonwealth eventually did not call Hooker as a witness does not affect the good faith basis of the questioning.[3] In addition, any suggestion that the defendant

---

[3] In such circumstances, a judge may require a voir dire of the witness (here, Hooker) before permitting the inquiry.

possessed a firearm was cumulative of the testimony of other witnesses.[4]

4. *Closing argument.* The defendant maintains that the prosecutor argued improperly in several respects. Because there were no objections to these remarks, our inquiry is limited to whether these statements were improper and, if so, whether they created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Semedo*, 456 Mass. 1, 15 (2010). We consider each in turn.

a. *References to "justice."* The defendant alleges that the prosecutor improperly exhorted the jury to do justice. The prosecutor mentioned "justice" twice in his closing. At the outset, he said that the defendant should be convicted on the basis of "justice and the evidence." He ended his closing by seeking a conviction as "the only verdict that justice, the only verdict that the evidence, the only verdict that you could possibly give based on this overwhelming evidence of the defendant's guilt." Each time, the emphasis was on a conviction based on the evidence.[5] There was no impropriety.

b. *Argument that the defendant should be "held accountable."* The defendant asserts that it was wrong to say that he should "be

---

[4]The defendant argues in addition that the prosecutor used an "unidentified" document in an attempt to refresh the mother's memory when she had not asserted any failure of memory, and that the prosecutor never gave her an opportunity to testify about the document or her memory. Rather, he merely left the jury with a sense that he had impeached the mother and that he possessed undisclosed information about the gun and a dispute between the defendant and Hooker. Although a witness's memory may be refreshed with anything, *Commonwealth* v. *O'Brien*, 419 Mass. 470, 478 (1995), the mother did not assert a failure of memory and negative responses are not the equivalent of a failure of memory. Cf. *Commonwealth* v. *Vuthy Seng*, 456 Mass. 490, 500-501 (2010). In any event, as explained above, there was no prejudice to the defendant.

[5]The defendant seeks support for this allegedly improper use of the word "justice" from a quotation in *Commonwealth* v. *Torres*, 437 Mass. 460, 464-465 (2002), where we concluded that it is improper to enlist jurors in a "call for justice" or to ask jurors to hold a defendant "accountable for what he did." In the *Torres* case, the argument was objectionable not because of the use of the word "justice," but because the closing was an "improper exhortation that the jurors vindicate the victim [combined] with an improper appeal to sympathy." *Id.* at 465. The prosecutor had asked the jury to answer the final call for help from an elderly victim to her deceased father. In the present case, the argument detailed the evidence and did not appeal to the jury's sympathy.

held accountable." The full remark was that "justice and the evidence demands that this [defendant] . . . be held accountable for that horrific act." Although not entirely clear, prior cases have suggested that holding the defendant accountable is improper language. See *Commonwealth* v. *Ruiz,* 442 Mass. 826, 837 (2004). But see *Commonwealth* v. *Molle,* 56 Mass. App. Ct. 621, 631 (2002). In any event, the remark could not have caused a substantial likelihood of a miscarriage of justice. The Commonwealth's case was strong, and the judge instructed the jury that closing arguments are not evidence and that the jurors must consider the evidence impartially without bias, prejudice, or sympathy. See *Commonwealth* v. *Ruiz, supra.*

c. *Alignment with the jury.* The defendant maintains that the prosecutor repeatedly and improperly used the word "we" to attempt to "align" himself with the jury and to convey his personal belief in the credibility of evidence. Several times the prosecutor said, "What do we know [about a certain event]?", "We know [that]," or "Let's start with . . . ."[6] As we said in *Commonwealth* v. *Espada,* 450 Mass. 687, 699 (2008), quoting *Commonwealth* v. *Mamay,* 407 Mass. 412, 424 (1990), "Merely using a 'first person pronoun does not interject personal belief into a statement.' " Although it is preferable that counsel avoid arguing in a form that seeks to engage the jury with him or her personally, such argument is not improper. It is merely a means of involving the jury and suggesting that the prosecutor and the jury review the evidence together.

*Commonwealth* v. *Burts,* 68 Mass. App. Ct. 684, 688 (2007), cited by the defendant, is not to the contrary. In the context there, the word "we" suggested to the jury that the prosecutor was informing them of information he knew. It is improper to use the term in such manner. The issue, however, does not turn on the presence or absence of the pronoun. Rather, it is what is being communicated that is key.

d. *Use of the phrase "mountain of evidence."* The defendant argues that the use of the words "mountain of evidence" to describe the case against him was an improper expression of personal belief. He cites *Commonwealth* v. *Tuitt,* 393 Mass. 801,

---

[6]Defense counsel likewise repeatedly employed the phrase "we know" during his closing, and also used the phrase "let's start with."

811 (1985), in support of this proposition. We are not persuaded. The comments of the respective prosecutors differed. In the *Tuitt* case, the prosecutor said, "The evidence is overwhelming, and I don't say that lightly . . . . We're confident on behalf of the Commonwealth that you will speak [the] truth and that this man, [the defendant,] is guilty as charged." These statements injected personal belief ("I don't say that lightly"; "We're confident on behalf of the Commonwealth . . . that this man, [the defendant,] is guilty as charged"). *Id.* at 811 n.9. There, the prosecutor was saying that the Commonwealth knew the defendant was guilty, not that the evidence demonstrated his guilt. The Commonwealth's confidence is irrelevant, and such statements imply that the prosecutor knows something that is not in the evidence. Here, there was no injection of personal belief, and the evidence against the defendant could fairly be described as a "mountain." (See the summary of the evidence against the defendant set forth in part 4.e, *infra*.) Even if use of the term had been improper, which it was not on this record, it is the type of rhetorical flourish that the jury could put in perspective. See *Commonwealth* v. *Semedo, supra* at 14.

e. *Misstatement of the evidence.* The defendant's next allegation is that the prosecutor misstated four pieces of evidence. "A prosecutor must limit comment in closing statement to the evidence and fair inferences that can be drawn from the evidence." *Commonwealth* v. *Semedo, supra* at 12, quoting *Commonwealth* v. *Pearce*, 427 Mass. 642, 646 (1998). The first asserted misstatement is that the prosecutor suggested that there had been an identification of the defendant by a witness, Karen Heinen, where none had been made. The words of the prosecutor were, "Heinen's testimony was that the driver of the car, [the victim,] was looking straight ahead, driving along, not paying any attention to her in stark contrast to *the defendant*, looking nervously, looking all around, looking at her five to ten times" (emphasis supplied). This statement, argues the defendant, indicated that Heinen had identified the defendant when she had not done so. Taken alone, a juror could have perceived this statement as referring to an identification of the defendant. However, in context, the jury would reasonably have understood that the prosecutor's reference to the individual described by the witness as "the defendant" was based on other evidence in

the record that supported the conclusion that the defendant was in fact the person whom Heinen observed.

Heinen's testimony on the subject was as follows. Shortly after 9 P.M. on December 15, 2001, Heinen was in front of her house at the corner of Juliette and Linden Streets in the Dorchester section of Boston when she saw a silver Lincoln Continental automobile with two people inside it drive by very slowly. She testified that the passenger was a slight black male about fifteen years younger than the driver. (Other testimony also described the victim as bigger and older than the defendant.) The passenger was moving about a great deal and looked at Heinen nervously several times. The car attempted to back into a parking space on Linden Street. Shortly thereafter, when Heinen was inside her apartment building, she heard what she believed to be the vehicle backfiring. From inside her apartment, she looked out a window and thought the passenger door of the vehicle was open. She telephoned 911, went out to her back porch, and saw the driver of the Lincoln Continental slumped over the dash board. A responding officer found a gray Lincoln Continental automobile on Linden Street with the passenger door open, its engine running, and music playing. Inside the vehicle, he found a black male in the driver's seat with a gunshot wound to the right side of his head and blood dripping down his face. The man was transported to the hospital and pronounced dead.

The context in which the statement was made reduces considerably the likelihood that the jury misunderstood. The prosecutor first described Heinen's testimony about seeing a nervous passenger who was younger and slighter than the driver. He continued by explaining that the defendant was the person who "fit[]" the description of the passenger. The prosecutor then summarized (for nearly forty pages of transcript) all the evidence that indicated that it was indeed the defendant in the passenger seat. This evidence included the fact that the defendant had threatened the victim with a gun; the defendant's statements (at different times) that he was "going to erase that dude," and was "going to get him"; Craig's observation several days before the murder of a gun in the defendant's car of the same caliber as the murder weapon; the defendant's humiliating beating and disrobing by the victim in front of some of the defendant's female friends the day before the murder; the defendant's telephone call

to the victim after the beating saying to the victim, "You didn't hurt me you just hurt yourself"; and the fact that the defendant and the victim were competitors in the drug business and the defendant was extremely angry at the victim for taking his customers from him.

Furthermore, as the prosecutor pointed out, the defendant had additional reason to resent the victim: the victim was in a very public romantic relationship with Miranda, an attractive young woman whom the defendant had unsuccessfully attempted to date. The prosecutor suggested further that consciousness of guilt evidence also incriminated the defendant. After the murder, the prosecutor added, the defendant left the area and went to North Carolina; although the cousins in the family had been close, he did not attend his cousin's funeral[7] or seek to comfort his aunt, the mother of the deceased, a woman with whom he had a warm familial relationship. The prosecutor also refuted the defense claim that another drug dealer could have killed the victim.

It was only after that extensive explanation why the defendant "fit" (was) the person Heinen saw in the car that the prosecutor said that Heinen's testimony was that the defendant was the second person in the car. Thus, the prosecutor linked the passenger to the defendant with much testimony to support the inference that the defendant shot the victim. In addition, the prosecutor made clear in other comments that Heinen had not identified the defendant. Although the opening statement was several days earlier, the prosecutor stated in his opening that Heinen did not identify the vehicle's passenger. The prosecutor referred to the lack of an identification again in closing argument. As the defendant concedes, before the challenged statement the prosecutor described Heinen's testimony accurately, and did not suggest that she could identify either occupant of the car in which the victim was found shot to death. We think it clear that the prosecutor merely extrapolated from other evidence that the person Heinen saw was the defendant and that the jury would have so understood.

The defendant's second claim of misstatement of evidence is that the prosecutor, in an effort to "create" consciousness of

---

[7]According to Craig, the defendant attended the wake for only ten minutes and did not view the body of the victim. (Craig referred to the wake as the funeral; the context makes clear that he was discussing the wake.)

guilt evidence, argued that just after the murder the defendant told his aunt, Lisa Smith, that he was in North Carolina. The defendant points to testimony by Smith that she in fact received that information from the defendant's mother. Each version has at least some basis in the record. Smith testified that, shortly after the murder, in a three-way telephone conversation among herself, the defendant and the defendant's mother, the defendant said he was "coming from North Carolina." Smith then corrected herself and said the defendant's mother was the one who had made this statement. Any discrepancy in the prosecutor's characterization of the testimony was not meaningful. It is clear from other witnesses' testimony, as well as that of the defendant's mother, that the defendant was in North Carolina after the murder. The defendant's mother stated that she did not see her son for at least four days after the murder because he was in North Carolina or "down south." Craig testified that he spoke with the defendant after the murder and asked the defendant where he had been. The defendant replied that he was in North Carolina the day the victim was killed and had seen news of the murder on television. In addition, a detective testified that the defendant said that he had driven to North Carolina the night before the murder, and had seen the news about the killing on television in North Carolina.

Third, the defendant asserts that the prosecutor improperly stated that the defendant admitted to pulling a gun on the victim at a barber shop in Brockton. This statement was supported by the evidence. Craig testified that the defendant had told him that he was in an altercation with the victim at a barber shop in Brockton and "pulled out a gun on [the victim.]" In addition, Miranda (the victim's girl friend) testified that she saw the defendant "showing" the victim the "nozzle" of a gun outside the barber shop in Brockton.

Finally, in regard to the misstatements of evidence, the defendant claims that the prosecutor improperly "created an admission by the defendant to the murder." This confusion occurred when the prosecutor referred to Dia DeMiranda[8] when he should have referred to Doreen Fernandez. There was testimony that Fernandez and DeMiranda were friends who were drug customers of

---

[8]Despite the similarity of names, Dia DeMiranda is to be distinguished from Tamisha Miranda.

the defendant. Fernandez, a witness for the Commonwealth, testified that in January, 2002, just after the murder, she and DeMiranda were with the defendant when he said that he would take care of DeMiranda "like he did Steve." Later, called as a defense witness, DeMiranda denied that the defendant had made such a threat. Given this evidence, the prosecutor properly repeated in his argument Fernandez's recounting of the threat. The prosecutor then stated that DeMiranda said that the defendant admitted "doing what he did to Steve." The Commonwealth concedes that the prosecutor misspoke by referring to DeMiranda when it is obvious that he meant to refer to Fernandez.

As the Commonwealth contends, the record makes it obvious that the mention of DeMiranda was simply a slip of the tongue. The remainder of the argument (in which the prosecutor characterizes the witness as, among other things, not a friend of the Commonwealth) makes it clear that the prosecutor was in fact referring to Fernandez. The lack of an objection indicates that the prosecutor simply misspoke. See *Commonwealth* v. *Maynard,* 436 Mass. 558, 571 (2002) (single inaccuracy in prosecutor's closing argument tempered by strong weight of evidence and judge's instructions and would have made no difference in jury's verdict); *Commonwealth* v. *O'Connell,* 432 Mass. 657, 660 (2000) (prosecutor's isolated misstatement regrettable but did not constitute reversible misstatement in context of entire case). Here the Commonwealth's evidence against the defendant was strong and the judge instructed the jury that closing arguments are not evidence.[9] In addition, it is the jury's recollection of the evidence that controls, see *Commonwealth* v. *Pillai,* 445 Mass. 175, 190 n.22, 191-192 (2005), and the jury are presumed to follow the judge's instructions. See *Commonwealth* v. *Maynard, supra,* citing *Commonwealth* v. *Stone,* 366 Mass. 506, 513 (1974).

5. *Right to testify.* The defendant argued in a motion for a new trial that his waiver of his right to testify was not valid because he did not understand that the decision whether to testify was his alone. He admits that he discussed the matter with his counsel, but claims that neither counsel nor the judge advised him that he was entitled to make the choice unilaterally. He asserts in this regard that neither counsel nor the judge

---

[9]Given the abundance of errors in the transcript, it is also possible that the stenographer simply wrote down the wrong word.

advised him that he had exculpatory testimony to present, specifically, that he could have disputed Craig's account of conversations, could have laid the foundation for third-party culprit evidence (regarding other drug dealers who had motive to kill the victim), and could have rebutted the Commonwealth's evidence of consciousness of guilt and motive. The judge denied the motion, and the defendant appealed.

We recognize that "the right to testify on one's own behalf in a criminal case is fundamental." *Commonwealth* v. *Novo*, 442 Mass. 262, 268 (2004), quoting *Commonwealth* v. *Degro*, 432 Mass. 319, 335 (2000). A right fundamental to a fair trial must be waived knowingly and intelligently. See *Commonwealth* v. *Santos*, 402 Mass. 775, 783 (1988), quoting *Spence* v. *Reeder*, 382 Mass. 398, 411 (1981). The decision whether to testify is an important strategic one to be made by the defendant in consultation with his attorney. See *Commonwealth* v. *Degro, supra.* It is the defendant's burden to prove that he did not waive this right knowingly and intelligently. See *Commonwealth* v. *Lucien*, 440 Mass. 658, 671 (2004).

The decision to deny a motion for a new trial lies within the sound discretion of the judge and will not be reversed unless it is manifestly unjust or the trial was infected with prejudicial constitutional error. *Id.* at 669-670. Reversal is particularly rare where the judge who acted on the motion was also the trial judge. *Id.* The judge did not abuse his discretion in concluding that the defendant's waiver was the product of a purposeful and informed judgment on his part.

The judge correctly rejected the defendant's contention that he did not know that the decision whether to testify was his and his alone. In his memorandum of decision on the motion for a new trial, the judge found that he had adequately informed the defendant of his right either to testify or not to testify. The judge summarized his colloquy with the defendant as follows:

"1. He has every right to testify in this case, and the defendant indicated orally that he understands that right;

"2. He has every right not to testify in this case and that the defendant indicated orally that he understood that right.

"3. If he, the defendant, decides not to testify, and if he

and his attorney request the [c]ourt to do so, the [c]ourt would give an instruction that the jury is not even to consider that in any way whatsoever, and that the defendant orally indicated that he understood that procedure.

"4. The [c]ourt asked the defendant directly whether he had any questions for the [c]ourt concerning his right to testify and his right not to testify, and the defendant orally responded that he did not have any questions."

The judge stated that he then questioned counsel in the presence of the defendant: "[A]nd I take it counsel that no decision has been made yet *as to whether the defendant wishes to testify or not.*" Counsel responded, "That's correct, your Honor."

The judge's statements do not deal directly with the defendant's assertion in his motion for a new trial that he should have been told that he could make the decision whether to testify irrespective of his attorney's advice. No such instruction is required. See *Commonwealth* v. *Waters*, 399 Mass. 708, 716-717 (1987). See also *Commonwealth* v. *Freeman*, 29 Mass. App. Ct. 635, 640 (1990).[10]

6. *Ineffective assistance of counsel.* The defendant maintains that he received ineffective assistance of counsel because his attorney failed to impeach Craig, the Commonwealth's key witness; failed to object during the closing argument; and failed to advise the defendant properly concerning whether he should testify. Because the defendant has been convicted of murder in the first degree, we consider his claim of ineffectiveness of counsel to determine whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E. This standard is more favorable to a defendant than the constitutional standard for determining the ineffectiveness of counsel. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). Thus, we consider whether there was error during the course of the trial and, if so, whether the error was "likely to have influenced the jury's conclusion." *Id.* at 682.

A strategic decision by an attorney, however, constitutes error

---

[10]In his memorandum of decision on the motion for a new trial, the judge found that there was no indication of any dispute or disagreement between the defendant and his counsel as to trial tactics or "of any kind."

"only if it was manifestly unreasonable when made." *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999), quoting *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998). The burden to prove ineffective assistance remains on the defendant even if memories have faded and rendered his task more difficult. See *Commonwealth* v. *Comita*, 441 Mass. 86, 93 (2004). We have applied a stringent standard of review to claims of ineffective assistance because of failure to impeach a witness. Failure to impeach a witness does not, standing alone, amount to ineffective assistance. *Commonwealth* v. *Bart B.*, 424 Mass. 911, 916 (1997). See *Commonwealth* v. *Garvin*, 456 Mass. 778, 791-792 (2010). See also *Commonwealth* v. *Roberts*, 423 Mass. 17, 21-22 (1996) (failure to impeach witness not ineffective assistance in prosecution for murder in first degree where attempting to impeach witness would not have helped defendant because witness's testimony was consistent with defendant's statements to other witnesses).

a. *Impeachment of Craig.* In regard to the defendant's claim that counsel did not impeach Craig sufficiently, the defendant states correctly that Craig's credibility was vital to the Commonwealth's case. The defendant maintains that there were four ways in which his attorney could have, but failed to, impeach Craig. We consider each in turn.

First, the defendant argues, counsel could have impeached Craig by the use of prior inconsistent statements comparing Craig's grand jury testimony and trial testimony concerning threatening statements made to him by the defendant. At the grand jury, Craig testified that he spoke with the defendant by telephone after the victim's death and that he (Craig) said, "I ain't [the victim] . . . you ain't gonna do to me what you did to him," whereas at trial, Craig attributes to the defendant the transposed statement, "[Y]ou don't want the same fuckin' thing to happen to you." No doubt there was a change in the testimony, and the trial testimony was far more incriminating.

The defendant argues that the impact of the damaging trial testimony could have been blunted if his counsel had impeached Craig with the version of the conversation that Craig gave to the grand jury. Any benefit from such impeachment, however, would have been undercut by other remarks of the defendant delivered at or about the same time and reported by Craig to the

grand jury.[11] The remainder of the conversation includes the defendant's denial that he committed the killing, but in a context in which he admits that he is capable of committing murder and that murder is an acceptable means of solving problems ("[I]f I wanted to fucking kill your ass I would have killed you yesterday . . . but I don't have to kill you. I'll have someone else do it"). The statements also include a threat to Craig ("you need to mind your business").

Thus, impeaching Craig by challenging him with his grand jury testimony would come at significant cost to the defendant, and a decision not to do so was not unreasonable. See *Commonwealth* v. *Wright, supra.* Even if it were a mistake, given the implication that the defendant was capable of murder, together with the other strong evidence against him, the choice was not likely to have influenced the outcome. See *id.*[12]

The second alleged failure to impeach Craig related to an incident several months after the murder in which Craig believed he was being threatened outside his house by people associated with the defendant. Craig gave differing versions of the incident to the police, to the grand jury, and at trial. Counsel did not impeach Craig with the discrepancies. In his affidavit filed with the defendant's motion for a new trial, counsel states that he had no strategic reason for not impeaching Craig concerning the details of this incident. There was no error that was likely to have influenced the jury's decision. See *id.* Regardless whether counsel intended the strategy, it was reasonable not to emphasize the discrepancies in the details of the statements; the incident was harmful to the defendant, suggesting consciousness of guilt and threats on his part. Dwelling on it would not have helped the defendant.

---

[11]Given that Craig missed no opportunities to incriminate the defendant, it is a virtual certainty that Craig would have volunteered these additional statements if given the chance on cross-examination. Failing that, they were available for redirect examination.

[12]The defendant argues also that the Commonwealth failed to provide him notice of the "change" in Craig's testimony. See *Brady* v. *Maryland*, 373 U.S. 83, 87-88 (1963) (government must provide defendant with exculpatory and material evidence). See also Mass. R. Crim. P. 14, as amended, 444 Mass. 1501 (2005). Although Craig testified differently at trial than he did at the grand jury, there is no indication the prosecutor was aware that Craig would change his testimony.

The next alleged shortcoming by defense counsel relates to his failure to impeach Craig concerning his testimony that approximately one week before the murder he discovered a .380 caliber handgun with a live round in the chamber in the defendant's van. This testimony was significant because the victim was killed with .380 caliber bullets and .380 caliber empty shells were found at the murder scene. Craig reported the incident to the police; there were discrepancies in the details of the events between the police report and Craig's trial testimony. The police report reflects Craig's statement that the defendant, not Craig, removed the gun from the compartment of the van; and the police report did not mention that Craig found live ammunition in the firearm or that the defendant's girl friend was present in the van. Although counsel states in his affidavit submitted with the motion for a new trial that he "had no strategic reason for not impeaching [Craig] with this report," the discrepancies were of no moment. The differences were of the type that could be expected to exist in two recountings of an incident made some time apart. Cross-examination on these minor inconsistencies would only have emphasized that the defendant possessed a weapon of the same caliber as the one that killed the victim.

The defendant also faults his attorney for impeaching Craig with only one of his four prior convictions. According to the defendant, this permitted the Commonwealth to portray Craig as a religious man who had graduated from Bible college, worked with a church, lived in church housing, and gave the eulogy at the victim's funeral. The defendant's claims are not borne out by the record. On cross-examination, Craig admitted that he had been convicted of uttering a forged document; that he was not an ordained minister; that he had purchased his clerical collar; and that he was familiar with illegal guns. In addition, the defendant's mother testified that Craig had been "locked up." As the judge stated in denying the motion for a new trial, the defendant's attorney did "a more than satisfactory job of impeaching Craig." By the end of cross-examination, Craig was unveiled as a man of "highly questionable character, an impostor clergyman, with [a] criminal conviction[],[13] who had been

---

[13]The judge referred to "convictions"; we consider this to be a typographical error or an insignificant mistake. Only one conviction was introduced.

previously incarcerated . . . and who admitted that he wiped his fingerprints off the defendant's gun before giving it back to [the defendant] showing his familiarity with guns and the need to conceal his involvement with [them]." Anything more, as the judge concluded, would have been "mere surplusage. The defendant's problem was not with the impeachment of Craig . . . or the alleged lack thereof, but was that there was such other evidence, direct and circumstantial, to support so much of Craig['s] testimony." We agree with this sound reasoning.

b. *Objections to closing argument.* The defendant claims that counsel was ineffective for failing to object to the segments of the closing argument discussed above. See part 4, *supra.* As we have concluded, in the main there was no impropriety, and certainly none that could possibly "make a difference in the jury's conclusions." *Commonwealth* v. *Kozec,* 399 Mass. 514, 518 (1987).[14]

c. *Advice on whether to testify.* The defendant faults his attorney for advising him not to testify and maintains that his testimony was essential to explain the differences between his version of events and those of other witnesses. The defendant's affidavit relates that he wanted to contradict Craig's account of the conversation in which the defendant allegedly threatened to kill the victim for competing with him in the drug business. He also desired to dispute Craig's description of the barber shop incident by explaining that at that time he merely showed a gun to the victim. According to the defendant, the victim sought a gun to protect himself against a man he had beaten up in prison whom he had now seen "on the street." The victim rejected the proffered weapon because it was "too small." The defendant also wished to relate that the victim had said he owed his Boston drug suppliers money for drugs he had "lost" and was worried

---

[14]At the conclusion of the charge, at sidebar, the judge asked counsel if he had omitted anything from his charge. Counsel replied, "I'm not sure you did, I wasn't paying attention, but I just want to be sure that in the jury instruction involving circumstantial evidence that there was the comment . . . ." Appellate counsel asserts that trial counsel's lack of objection might have been due to the fact that he "wasn't paying attention." However, defense counsel's statement appears to refer only to the fact that he was not paying attention to the instruction concerning circumstantial evidence and was not certain if the judge had omitted a certain comment. The instruction on circumstantial evidence is not challenged here.

about this debt, thereby providing a basis for a third-party culprit defense.

The defendant averred further that his testimony would explain that he had not gone to North Carolina after the killing. Rather, he had gone to New York for a "re-supply" of drugs, but he did not want to reveal this fact to anyone, least of all the police. Finally, the defendant stated that, given the fact he and the victim had had a fight the night before the murder (the fight in which the victim disrobed the defendant), and the accusation by Craig, he believed everyone "would think that I killed [the victim]."

In an affidavit filed with the defendant's motion for a new trial, the defendant's trial counsel identified two strategic reasons for advising the defendant not to testify: first, that the defendant would be impeached successfully by his serious criminal record; second, that he would be subject to "potentially damaging cross-examination" because of his false North Carolina alibi.[15] These are appropriate considerations. Counsel advised the defendant not to testify for good and sufficient reasons. See part 5, *supra.*

Even had the attorney's advice been substandard, it would have made no difference. For the defendant to prevail, the jury would have had to disbelieve the testimony of virtually every other witness. Such possibility was rendered even less likely by the impeachment of the defendant's credibility because of his criminal record. Any exculpatory version of the events outside the barber shop in Brockton was contradicted by abundant testimony. Not only did Craig testify that the defendant had said he attempted to "fuckin' buck that dude, man, but the gun got jammed," but Miranda said that, en route to Brockton that day, the victim and defendant engaged in an unpleasant telephone conversation in which she heard the defendant accuse the victim of stealing his customers and threaten to "mess [him] up." During the encounter outside the barber shop, Miranda again heard the defendant accuse the victim of stealing his customers and then saw the defendant show a gun. When the victim returned to the car, he said to Miranda, "I can't believe he f'n pulled out a gun on me."

---

[15]The testimony of other witnesses established that the North Carolina alibi was false with respect to the night of the killing, but that the defendant went to North Carolina thereafter.

The defendant asserts also that, had he testified, he could have provided a foundation for a third-party culprit defense inculpating a Boston drug supplier of the victim. The Commonwealth moved in limine to preclude reference to a third-party culprit. The judge deferred action on the request and trial counsel did attempt to suggest the existence of an unnamed supplier who could have had a motive to harm the victim. Due to counsel's inability to identify any person or present anything other than hearsay, the judge correctly excluded third-party culprit evidence. In his affidavit, trial counsel admits that he did not have the name of the victim's supplier. In his own affidavit, the defendant mentions only that he knew that the victim had two unnamed suppliers in Boston. A defendant may offer third-party culprit evidence where "the acts of another person are 'so closely connected in point of time and method of operation as to cast doubt upon the identification of [the] defendant as the person who committed the crime.' " *Commonwealth* v. *Holliday*, 450 Mass. 794, 811 (2008), quoting *Commonwealth* v. *Conkey*, 443 Mass. 60, 66 (2004). Nothing has been presented that would have permitted the pursuit of a third-party culprit defense.[16]

The defendant's claim that he could refute the evidence that he was in North Carolina after the murder is also not availing. Any such testimony was contradicted by his own mother, who stated that after the murder her son was in North Carolina. We have only found ineffective assistance of counsel for a strategic decision regarding trial of the case if the decision constitutes a manifestly unreasonable choice. See *Commonwealth* v. *Montez*, 450 Mass. 736, 754-755 (2008). This is plainly not such a situation. See *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999), quoting *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998).

7. *Review under G. L. c. 278, § 33E.* We have reviewed the entire record and have considered all the issues on appeal. We

---

[16]The defendant asserts that he was prejudiced by his counsel's promise that he would present evidence of a third-party culprit in his opening statement. That evidence promised in an opening statement does not materialize does not necessarily amount to ineffective assistance. See *Commonwealth* v. *Garvin*, 456 Mass. 778, 791 (2010), citing *Commonwealth* v. *McMahon*, 443 Mass. 409, 425 (2005). In any event, trial counsel did not state that the evidence would be forthcoming, but carefully presented the theory as a possibility.

conclude that there is no reason to exercise our power under
G. L. c. 278, § 33E, to order a new trial or to reduce the defend-
ant's murder conviction to a lesser degree of guilt.

*Judgment affirmed.*

*Order denying motion for*
*new trial affirmed.*